## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

GOVERNMENT EMPLOYEES INSURANCE CO., GEICO INDEMNITY CO., GEICO GENERAL INSURANCE COMPANY and GEICO CASUALTY CO.,

      Plaintiffs,

vs.

**Case No.:**

DAVID KALIN, M.D., HIMES WALK IN CLINIC L.L.C., MAIKEL CABRERA L.M.T., NORMA CABEZAS, L.M.T., EVELIN PEREZ, L.M.T., JOSEFINA SOSA, L.M.T., FLORIDA WELLNESS CENTER, INC., JANIS GOMEZ, MARISOL VAZQUEZ, L.M.T., PERSONAL REHABILITATION CENTER, INC., ARIEL SANTOS, YAHUMARA UGARTE, L.M.T., YBOR MEDICAL INJURY AND ACCIDENT CLINIC, INC, ANGELA DUNCAN, MARIA PADRON, L.M.T., NOVA DIAGNOSTICS, CORP, ANTONIA GUERRA, MARIE ANTOINETTE BRISTER, M.D., PATRICK LEE AGDAMAG, M.D., MARIA RAMOS, L.M.T., AND JANET DE LA CRUZ, L.M.T.

      Defendants.

_____/

## COMPLAINT AND DEMAND FOR A JURY TRIAL

Plaintiffs, Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. (collectively "GEICO" or "Plaintiffs"), sue Defendants and allege as follows:

1.      This action seeks to recover more than $4,900,000.00 that Defendants wrongfully obtained from GEICO by submitting, and causing to be submitted, thousands of fraudulent no-fault ("no-fault", "personal injury protection", or "PIP") insurance charges through Defendants Himes Walk in Clinic, L.L.C. ("Himes Clinic"), Florida Wellness Center, Inc. ("Florida Wellness"), Personal Rehabilitation, Inc. ("Personal Rehabilitation"), Ybor Medical Injury and Accident Clinic, Inc. ("Ybor Medical"), and Nova Diagnostics, Corp ("Nova Diagnostics")(collectively, the "Clinic Defendants"), relating to medically unnecessary, illusory, unlawful, and otherwise non-reimbursable health care services, including putative initial examinations, follow up examinations, physical therapy services, range of motion testing, and muscle strength testing (collectively the "Fraudulent Services"), that purportedly were provided to Florida automobile accident victims ("Insureds") who were eligible for coverage under GEICO no-fault insurance policies. In addition, GEICO seeks a declaration that it is not legally obligated to pay reimbursement of pending, fraudulent no-fault insurance claims that Defendants have submitted or caused to be submitted through the Clinic Defendants, because of the fraudulent and unlawful activity set forth herein.

2.      Each and every charge submitted through the Clinic Defendants since at least 2015 has been fraudulent and unlawful for the reasons set forth herein. The charts annexed hereto as Exhibits "1" – "5" set forth a large and representative sample of the fraudulent and unlawful claims that have been identified to date that have been

submitted to GEICO by mail through the respective Clinic Defendants. The Defendants' interrelated fraudulent schemes began no later than 2015, and have continued uninterrupted since that time.

## THE PARTIES

3.     Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. (collectively, "GEICO") are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in Florida.

4.     The Defendants are as follows:

(i)     Defendant David Kalin, M.D. ("Kalin") resides in and is a citizen of Florida. Kalin was licensed to practice medicine in Florida on March 18, 1980. Kalin purported to be the owner and member of Himes Clinic, falsely purported to serve as medical director at Florida Wellness, Personal Rehabilitation, and Ybor Medical, and falsely purported to personally perform or directly supervise most of the Fraudulent Services on behalf of each of the Clinic Defendants.

(ii)     Defendant Himes Clinic is a Florida limited liability company with its principal place of business in Tampa, Florida.  At all relevant times, Himes Clinic falsely purported to be a properly exempted health care clinic under Fla. Stat. § 400.9905(4)(g). Himes Clinic was organized in Florida on or about January 18, 2013, purported to be owned and controlled by Kalin and to have Kalin as its member, and was used as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers, including billing for Fraudulent Services that purportedly were performed by Defendants Kalin, Norma Cabezas, L.M.T. ("Cabezas"), Maikel Cabrera, L.M.T. ("Cabrera"), Josefina Sosa, L.M.T. ("Sosa"), and Evelin Perez, L.M.T. ("Perez")(Defendants Himes Clinic, Kalin, Cabezas, Cabrera, Sosa, and Perez collectively are referred to as the "Himes Clinic Defendants").

(iii)   Defendant Florida Wellness is a Florida corporation with its principal place of business in Tampa, Florida. At all relevant times, Florida Wellness falsely purported to be a properly-licensed health care clinic that operated in compliance with the licensing and operating requirements set forth in the Florida Health Care Clinic Act (the "Clinic Act", Fla. Stat. § 400.990 et seq.). Florida Wellness was incorporated in Florida on or about June 28, 2013, purported to be owned and controlled by Defendant Janis Gomez ("Gomez"), falsely purported to have Kalin as its legitimate medical director, and was used as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers, including billing for Fraudulent Services that purportedly were performed by Defendants Kalin and Marisol Vazquez, L.M.T. ("Vazquez")(Defendants Florida Wellness, Gomez, Kalin, and Vazquez collectively are referred to as the "Florida Wellness Defendants").

(iv)   Defendant Personal Rehabilitation is a Florida corporation with its principal place of business in Tampa, Florida. At all relevant times, Personal Rehabilitation falsely purported to be a properly-licensed health care clinic that operated in compliance with the licensing and operating requirements set forth in Clinic Act. Personal Rehabilitation was incorporated in Florida on or about October 13, 2006, purported to be owned and controlled by Defendant Ariel Santos ("Santos"), falsely purported to have Kalin as its legitimate medical director, and was used as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers, including billing for Fraudulent Services that purportedly were performed by Defendants Kalin and Yahumara Ugarte, L.M.T. ("Ugarte")(Defendants Personal Rehabilitation, Santos, Kalin, and Ugarte collectively are referred to as the "Personal Rehabilitation Defendants").

(v)   Defendant Ybor Medical is a Florida corporation with its principal place of business in Tampa, Florida. At all relevant times, Ybor Medical falsely purported to be a properly-licensed health care clinic that operated in compliance with the licensing and operating requirements set forth in Clinic Act. Ybor Medical was incorporated in Florida on or about February 18, 2002, purported to be owned and controlled by Defendant Angela Duncan ("Duncan"), falsely purported to have Kalin as its legitimate medical director, and was used as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers, including billing for Fraudulent Services that purportedly were performed by Defendants Kalin and Maria Padron, L.M.T.

("Padron")(Defendants Ybor Medical, Duncan, Kalin, and Padron collectively are referred to as the "Ybor Medical Defendants").

(vi)     Defendant Nova Diagnostics is a Florida corporation with its principal place of business in Tampa, Florida. At all relevant times, Nova Diagnostics falsely purported to be a properly-licensed health care clinic that operated in compliance with the licensing and operating requirements set forth in the Clinic Act. Nova Diagnostics was incorporated in Florida on or about August 1, 2016, purported to be owned and controlled by Defendant Antonia Guerra ("Guerra"), falsely purported to have Marie Antoinette Brister, M.D. ("Brister") and Patrick Lee Agdamag, M.D. ("Agdamag) as its legitimate medical directors, and was used as a vehicle to submit fraudulent no-fault insurance billing to GEICO and other insurers, including billing for Fraudulent Services that purportedly were performed by Defendants Kalin, Janet De La Cruz, L.M.T. ("De La Cruz") and Maria Ramos, L.M.T. ("Ramos")(Defendants Nova Diagnostics, Guerra, Kalin, Brister, Agdamag, De La Cruz, and Ramos collectively are referred to as the "Nova Diagnostics Defendants").

(vii)    All of the natural person Defendants reside in and are citizens of Florida.

## JURISDICTION AND VENUE

5.       This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the total matter in controversy, exclusive of interest and costs, exceeds the jurisdictional threshold of $75,000.00, and is between citizens of different states.

6.       This Court also has original jurisdiction pursuant to 28 U.S.C. § 1331 over claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") ACT).

7.       In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

8.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Middle District of Florida is the District where one or more of Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS

### I.     Brief Overview of Pertinent Law Governing No-Fault Insurance Reimbursement

9.     Florida requires automobile insurers to provide PIP insurance benefits ("PIP Benefits") to Insureds when they are injured in a motor vehicle accident. See Florida Motor Vehicle No-Fault Law, Fla. Stat. §§ 627.730-627.7405 (the "No-Fault Law").

10.     Under the No-Fault Law, a health care services provider who possesses an assignment of PIP Benefits from an Insured and who provides medically necessary health care services to an Insured may submit claims directly to an insurance company in order to receive payment for medically necessary services, using the required claim forms, including the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 form" or "CMS-1500" form).

11.     In order for a health care service to be eligible for PIP reimbursement, it must be "lawfully" provided, medically necessary, and the bill for the service cannot misrepresent the nature or extent of the service that was provided. Insurers such as GEICO are not required to pay anyone who knowingly submits a false or misleading statement relating to a PIP claim or charges.  See Fla. Stat. § 627.736.

12.    In addition, the No-Fault Law prohibits PIP reimbursement for massage or for services provided by unsupervised massage therapists. <u>See</u> Fla. Stat. § 627.736.

13.    Moreover, Florida law requires registered chiropractic assistants to work under the direct supervision of a licensed chiropractic physician. <u>See</u> Fla. Stat. § 460.403(7).   Accordingly, insurers such as GEICO are not required to pay PIP reimbursement for services that are unlawfully performed by unsupervised registered chiropractic assistants.

14.    Subject to certain limited exceptions, a license issued by the Florida Agency for Health Care Administration is required in order to operate a clinic in Florida. <u>See</u> Fla. Stat. § 400.991(1)(a).

15.    However, the Clinic Act provides an exemption from the clinic licensing requirements for:

> A sole proprietorship, group practice, partnership, or corporation that provides health care services by licensed health care practitioners . . . <u>that is wholly owned by one or more licensed health care practitioners</u>, or the licensed health care practitioners set forth in this paragraph and the spouse, parent, child, or sibling of a licensed health care practitioner <u>if one of the owners who is a licensed health care practitioner is supervising the business activities and is legally responsible for the entity's compliance with all federal and state laws. However, a health care practitioner may not supervise services beyond the scope of the practitioner's license</u> ... .

Fla. Stat. § 400.9905(4)(g)(emphasis added).

16.    In order to qualify for the "wholly owned" exemption under the Clinic Act, the licensed health care practitioner has a continuing obligation to supervise the

business activities of the clinic and remain legally responsible for the entity's compliance with all federal and state laws.

17.     Pursuant to the Clinic Act, clinics operating in Florida without a valid exemption from the licensing requirements must – among other things – appoint a medical director who must "[c]onduct systematic reviews of clinic billings to ensure that the billings are not fraudulent or unlawful", and take immediate corrective action upon discovery of a fraudulent or unlawful charge. See Fla. Stat. § 400.9935(1). In addition, a clinic medical director must "[e]nsure that all health care practitioners at the clinic have active appropriate certification or licensure for the level of care being provided." See Fla. Stat. § 400.9935(1).

18.     Pursuant to the Clinic Act, "[a] charge or reimbursement claim made by or on behalf of a clinic that is required to be licensed . . . but that is not so licensed, or that is otherwise operating in violation of this part . . . is an unlawful charge." See Fla. Stat. § 400.9935(3).

## II.     Defendants' Interrelated Fraudulent Schemes

### A.     The Unlawful Operation of Himes Clinic Without Supervision by Kalin

19.     Although Himes Clinic purported to be exempt from the Clinic Act's health care clinic licensure requirements, Himes Clinic operated without a valid exemption and, as a result, operated as an unlicensed health care clinic in violation of the Clinic Act.

20.     In particular, Kalin failed to supervise Himes Clinic's business activities as required by the Clinic Act and, as a result, Himes Clinic did not qualify for the "wholly owned" exemption from the Clinic Act's health care clinic licensure requirements.

21.     Kalin never legitimately supervised the business activities of Himes Clinic, inasmuch as Kalin never conducted reviews of the billing or treatment records from Himes Clinic to ensure that the billing was not fraudulent or unlawful, and never even made any attempt to discover the unlawful charges submitted through Himes Clinic

22.     Indeed, given the fraudulent treatment and billing protocol described below – which was pervasive across all of the billing submitted to GEICO through Himes Clinic – there is simply no way that Kalin could have legitimately supervised the business activities of Himes Clinic to ensure that the billing was not fraudulent or ensure compliance with all applicable federal and state laws as required by the Clinic Act.

23.     Had Kalin legitimately supervised the business activities of Himes Clinic, Kalin would have noted, among other things, that:

(i)     Himes Clinic was operating in pervasive violation of the Clinic Act;

(ii)    the Fraudulent Services purportedly provided by and billed through Himes Clinic were not medically necessary, and were provided – to the extent that they were provided at all – pursuant to a pre-determined fraudulent protocol;

(iii)    in many cases, the Fraudulent Services purportedly provided by and billed through Himes Clinic never were provided in the first instance; and

(iv)    the billing codes used for the Fraudulent Services purportedly provided by and billed through Himes Clinic misrepresented and exaggerated the level of services that purportedly were provided in order to fraudulently inflate the charges submitted to GEICO.

24.    Accordingly, Himes Clinic never qualified for the "wholly owned" exemption from licensure as a "health care clinic" set forth in Section 400.9905(4)(g). Nor did Himes Clinic qualify for any other exemption to the Clinic Act, or have a medical director as required for a health care clinic without an exemption. As a result, Himes Clinic operated – at all relevant times – in violation of the Clinic Act.

**B.    The Fraudulent Operation of Florida Wellness, Personal Rehabilitation, Ybor Medical, and Nova Diagnostics Without Legitimate Medical Directors**

25.    Because Florida Wellness, Personal Rehabilitation, Ybor Medical, and Nova Diagnostics were subject to the Clinic Act and did not qualify for any exemptions, Gomez, Santos, Duncan, and Guerra (collectively the "Clinic Owner Defendants") could not operate Florida Wellness, Personal Rehabilitation, Ybor Medical, and Nova Diagnostics, respectively, unless licensed physicians were employed as the medical directors at these clinics. However, if the Clinic Owner Defendants retained legitimate physicians to serve as Florida Wellness, Personal Rehabilitation, Ybor Medical, and Nova Diagnostics' respective medical directors, any such legitimate physicians actually would be obligated to fulfill the statutory requirements applicable to a clinic medical

director, which would impede the Defendants' interrelated schemes, as described herein.

26.     Accordingly, Gomez, Santos, and Duncan each retained Kalin, a licensed physician who was willing – in exchange for compensation – to falsely pose as the legitimate medical director at Florida Wellness, Personal Rehabilitation, and Ybor Medical, respectively.

27.     Likewise, Guerra retained Brister and then Agdamag, both licensed physicians who were willing – in exchange for compensation – to falsely pose as the legitimate medical directors at Nova Diagnostics.

28.     However, the Kalin, Brister, and Agdamag (collectively the "Medical Director Defendants") never genuinely served as medical directors for Florida Wellness, Personal Rehabilitation, Ybor Medical, or Nova Diagnostics. Instead, from the beginning of each of their associations with these respective clinics, they ceded all day-to-day decision-making and oversight regarding healthcare services to the respective Clinic Owner Defendants and their associates.

29.     As set forth herein, in keeping with the fact that the Medical Director Defendants never legitimately served as medical directors at Florida Wellness, Personal Rehabilitation, Ybor Medical, or Nova Diagnostics, the Medical Director Defendants: (i) never ensured that all health care practitioners at Florida Wellness, Personal Rehabilitation, Ybor Medical, or Nova Diagnostics had active appropriate certification or licensure for the level of care being provided; (ii) never conducted

11

systematic reviews of Florida Wellness, Personal Rehabilitation, Ybor Medical, or Nova Diagnostics' billings to ensure that the billings were not fraudulent or unlawful; and (iii) and never even made any attempt to discover the fraudulent and unlawful charges submitted through Florida Wellness, Personal Rehabilitation, Ybor Medical, or Nova Diagnostics, much less take any immediate corrective action. See Fla. Stat. § 400.9935(1).

30.     In further keeping with the fact that Kalin never legitimately served as medical director at any of the Clinic Defendants, Kalin simultaneously: (i) purported to serve as medical director at numerous other Florida clinics; (ii) purported to own, control, and supervise the business activities at Himes Clinic; and (iii) purported to personally perform, or at least directly supervise, a massive number of individual health care services for all of the Clinic Defendants.

31.     It is improbable – to the point of impossibility – that Kalin could have simultaneously fulfilled these various roles while also fulfilling his medical director role at any of the Clinic Defendants.

32.     The Clinic Owner Defendants used the façade of the Medical Director Defendants' phony "appointments" as Florida Wellness, Personal Rehabilitation, Ybor Medical, and Nova Diagnostics' respective "medical directors" to do indirectly what they were forbidden from doing directly – namely, and as set forth more fully herein: (i) to operate health care clinics without legitimate medical directors; (ii) to engage in unlicensed medical decision-making with respect to the Insureds who sought

treatment at Florida Wellness, Personal Rehabilitation, Ybor Medical, and Nova Diagnostics; (iii) to permit health care services to be provided at Florida Wellness, Personal Rehabilitation, Ybor Medical, and Nova Diagnostics by individuals who lacked the proper licensure to perform the services; and (iv) to use Florida Wellness, Personal Rehabilitation, Ybor Medical, and Nova Diagnostics as vehicles to submit a massive amount of fraudulent PIP billing to GEICO and other insurers.

33.     The Medical Director Defendants unlawfully permitted the Clinic Owner Defendants to dictate every aspect of the manner in which Insureds would be treated at Florida Wellness, Personal Rehabilitation, Ybor Medical, and Nova Diagnostics, respectively, and to dictate every aspect of the manner in which health care services at these clinics would be billed to GEICO and other insurers, because they sought to continue profiting from the fraudulent billing submitted through these clinics.

**C.     The Fraudulent Misrepresentations Regarding the Identities of the Health Care Providers Rendering Services at Himes Clinic, Florida Wellness, Personal Rehabilitation, Ybor Medical, and Nova Diagnostics**

34.     Each of the Defendants caused GEICO to be billed for a limited range of Fraudulent Services, namely purported: (i) initial patient examinations; (ii) follow-up patient examinations; and (iii) physical therapy services. As set forth in Exhibits "1" – "5", the purported physical therapy services constituted the vast majority of the Fraudulent Services billed through each of the Clinic Defendants to GEICO.

35.     All of the "physical therapy" services that Defendants purported to provide between at least 2015 and the present were performed – to the extent that

they were performed at all – by completely unsupervised massage therapists and/or registered chiropractic assistants including: (i) Cabezas, Cabrera, Sosa, and Perez at Himes Clinic; (ii) Vazquez at Florida Wellness; (iii) Ugarte at Personal Rehabilitation (iv) Padron at Ybor Medical; and (v) De La Cruz and Ramos at Nova Diagnostics.

36.     Cabezas, Cabrera, Sosa, and, Perez, Vazquez, Ugarte, Padron, De La Cruz, and Ramos (collectively the "Massage Therapist Defendants") were only licensed as massage therapists and/or registered chiropractic assistants. The Massage Therapist Defendants were never licensed as physical therapists or chiropractors.

37.     The Defendants were well-aware of the fact that health care clinics such as the Clinic Defendants could not legally recover PIP Benefits for "physical therapy" or any other kinds of health care services performed by unsupervised massage therapists and/or registered chiropractic assistants such as the Massage Therapist Defendants.

38.     Accordingly, in 2015, the Defendants began to falsely represent – in a substantial majority of the bills for "physical therapy" services that they submitted or caused to be submitted through the respective Clinic Defendants to GEICO – that Kalin, a licensed physician, had either personally performed or directly supervised the putative physical therapy services.

39.     In reality, Kalin neither performed nor supervised any of the physical therapy services that were billed through Himes Clinic, Florida Wellness, Personal Rehabilitation, Ybor Medical, and Nova Diagnostics to GEICO.

40.    In keeping with the fact that Kalin neither performed nor directly supervised any of the physical therapy services that were billed through the Clinic Defendants to GEICO, Kalin – who was in his late 60s at the time – often purported to personally perform or directly supervise more than 20, 25, 30, or even 40 hours of "physical therapy" services for GEICO Insureds on individual dates, often at several of the Clinic Defendants, and at several different locations, per day.

41.    For example:

(i)    On May 13, 2015, Ybor Medical, Duncan, and Kalin purported to provide at least 20 individual physical therapy services to at least to at least two individual Insureds, and falsely contended in the resulting bills to GEICO that Kalin personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 3 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Kalin also purported to personally perform, or at least directly supervise at least 167 additional physical therapy services purportedly provided to at least 25 additional GEICO Insureds at Personal Rehabilitation and Himes Clinic, including at least 23 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 26 hours of services that Kalin purported to personally perform, or at least directly supervise, on May 13, 2015.

(ii)   On March 15, 2016, Himes Clinic and Kalin purported to provide at least 35 individual physical therapy services to at least to at least 5 individual Insureds, and falsely contended in the resulting bills to GEICO that Kalin personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Kalin also purported to personally perform, or at least directly supervise: (a) one forty-five minute initial patient examination at Ybor Medical and; and (b) at least 288 additional physical therapy services purportedly provided to at

least 41 <u>additional</u> GEICO Insureds at Personal Rehabilitation, Florida Wellness, and Ybor Medical including at least 34.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 40.5  hours of services that Kalin purported to personally perform, or at least directly supervise, on March 15, 2016.

(iii)   On September 7, 2016, Ybor Medical, Duncan, and Kalin purported to provide at least 40 individual physical therapy services to at least to at least four individual Insureds, and falsely contended in the resulting bills to GEICO that Kalin personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 5.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Kalin <u>also</u> purported to personally perform, or at least directly supervise at least 151 <u>additional</u> physical therapy services purportedly provided to at least 22 <u>additional</u> GEICO Insureds at Florida Wellness and Himes Clinic, including at least 20.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 26 hours of services that Kalin purported to personally perform, or at least directly supervise, on September 7, 2016.

(iv)   On October 31, 2016, Florida Wellness, Gomez, and Kalin purported to provide at least 88 individual physical therapy services to at least to at least 12 individual Insureds, and falsely contended in the resulting bills to GEICO that Kalin personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 9.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Kalin <u>also</u> purported to personally perform, or at least directly supervise: (a) three forty-five minute initial patient examinations at Florida Wellness; (b) one sixty minute initial patient examination at an additional facility; and (c) at least 170 <u>additional</u> physical therapy services purportedly provided to at least 24 <u>additional</u> GEICO Insureds at Personal Rehabilitation, Himes Clinic, and Ybor Medical, including at least 22.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 32

hours of services that Kalin purported to personally perform, or at least directly supervise, on October 31, 2016.

(v)    On November 10, 2016, Himes Clinic and Kalin purported to provide at least 14 individual physical therapy services to at least to at least 2 individual Insureds, and falsely contended in the resulting bills to GEICO that Kalin personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 3 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Kalin <u>also</u> purported to personally perform, or at least directly supervise: (a) one forty-five minute initial patient examination at Ybor Medical and; and (b) at least 209 <u>additional</u> physical therapy services purportedly provided to at least 30 <u>additional</u> GEICO Insureds at Personal Rehabilitation, Florida Wellness, and Ybor Medical including at least 25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 28.75 hours of services that Kalin purported to personally perform, or at least directly supervise, on November 10, 2016.

(vi)   On January 3, 2017, Florida Wellness, Gomez, and Kalin purported to provide at least 62 individual physical therapy services to at least to at least eight individual Insureds, and falsely contended in the resulting bills to GEICO that Kalin personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 9.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Kalin <u>also</u> purported to personally perform, or at least directly supervise: (a) three forty-five minute initial patient examinations at Florida Wellness: (b) one sixty minute initial patient examination at an additional facility; and (c) at least 138 <u>additional</u> physical therapy services purportedly provided to at least 22 <u>additional</u> GEICO Insureds at Personal Rehabilitation, Himes Clinic, Top Wellness Center Corp ("Top Wellness"), and The Health Place, including at least 17 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 29.5 hours of services that Kalin purported to personally perform, or at least directly supervise, on January 3, 2017.

(vii)   On January 5, 2017, Personal Rehabilitation, Santos, and Kalin purported to provide at least 98 individual physical therapy services to at least to at least 15 individual Insureds, and falsely contended in the resulting bills to GEICO that Kalin personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 11.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Kalin also purported to personally perform, or at least directly supervise at least 101 additional physical therapy services purportedly provided to at least 14 additional GEICO Insureds at Florida Wellness and Top Wellness, including at least 13.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 25 hours of services that Kalin purported to personally perform, or at least directly supervise, on January 5, 2017.

(viii)  On August 21, 2017, Nova Diagnostics, Guerra, Brister, and Kalin purported to provide at least 25 individual physical therapy services to at least to at least four individual Insureds, and falsely contended in the resulting bills to GEICO that Kalin personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 3.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Kalin also purported to personally perform, or at least directly supervise: (a) two forty five minute initial patient examinations; and (b) at least 150 additional physical therapy services purportedly provided to at least 19 additional GEICO Insureds at Florida Wellness, Himes Clinic, Personal Rehabilitation and Ybor Medical, including at least 18 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 22.75 hours of services that Kalin purported to personally perform, or at least directly supervise, on August 21, 2017.

(ix)    On November 20, 2017, Nova Diagnostics, Guerra, Agdamag, and Kalin purported to provide at least 36 individual physical therapy services to at least to at least six individual Insureds, and falsely contended in the resulting bills to GEICO that Kalin personally performed or at least directly supervised every one of those treatments. What is more, those

putative treatments included at least 4.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Kalin <u>also</u> purported to personally perform, or at least directly supervise at least 149 <u>additional</u> physical therapy services purportedly provided to at least 20 <u>additional</u> GEICO Insureds at Florida Wellness, Himes Clinic, Personal Rehabilitation, Ybor Medical, and Top Wellness including at least 20.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 25.5 hours of services that Kalin purported to personally perform, or at least directly supervise, on November 20, 2017.

(x)    On January 4, 2018, Ybor Medical, Duncan, and Kalin purported to provide at least 30 individual physical therapy services to at least to at least three individual Insureds, and falsely contended in the resulting bills to GEICO that Kalin personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Kalin <u>also</u> purported to personally perform, or at least directly supervise at least 124 <u>additional</u> physical therapy services purportedly provided to at least 20 <u>additional</u> GEICO Insureds at Florida Wellness, Personal Rehabilitation, Himes Clinic, and Nova Diagnostic including at least 17.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 22.25 hours of services that Kalin purported to personally perform, or at least directly supervise, on January 4, 2018.

(xi)   On February 12, 2018, Nova Diagnostics, Guerra, Agdamag, and Kalin purported to provide at least 34 individual physical therapy services to at least to at least five individual Insureds, and falsely contended in the resulting bills to GEICO that Kalin personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 4.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Kalin <u>also</u> purported to personally perform, or at least directly supervise: (a) three forty five minute initial patient examinations; and (b) at least 167 <u>additional</u> physical therapy services purportedly

provided to at least 22 <u>additional</u> GEICO Insureds at Florida Wellness, Himes Clinic, Personal Rehabilitation, and Ybor Medical, including at least 22.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 29.75 hours of services that Kalin purported to personally perform, or at least directly supervise, on February 12, 2018.

(xii)   On February 23, 2018, Personal Rehabilitation, Santos, and Kalin purported to provide at least 109 individual physical therapy services to at least to at least 17  individual Insureds, and falsely contended in the resulting bills to GEICO that Kalin personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 13.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Kalin <u>also</u> purported to personally perform, or at least directly supervise at least 95 <u>additional</u> physical therapy services purportedly provided to at least 10 <u>additional</u> GEICO Insureds at Florida Wellness and Ybor Medical, including at least 13.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 27.5 hours of services that Kalin purported to personally perform, or at least directly supervise, on February 23, 2018.

(xiii)   On May 26, 2018, Personal Rehabilitation, Santos, and Kalin purported to provide at least 155 individual physical therapy services to at least to at least  22 individual Insureds, and falsely contended in the resulting bills to GEICO that Kalin personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 20.25  hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Kalin <u>also</u> purported to personally perform, or at least directly supervise at least 150 <u>additional</u> physical therapy services purportedly provided to at least 22 <u>additional</u> GEICO Insureds at Florida Wellness, Himes Clinic, Nova Diagnostics, and Eminence Medical, including at least 16.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 42 hours of services

that Kalin purported to personally perform, or at least directly supervise, on May 26, 2018.

(xiv)   On April 9, 2019, Himes Clinic and Kalin purported to provide at least 28 individual physical therapy services to at least to at least 4 individual Insureds, and falsely contended in the resulting bills to GEICO that Kalin personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 3.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Kalin <u>also</u> purported to personally perform, or at least directly supervise at least 147 <u>additional</u> physical therapy services purportedly provided to at least 22 <u>additional</u> GEICO Insureds at Personal Rehabilitation and Florida Wellness including at least 18.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 21.75 hours of services that Kalin purported to personally perform, or at least directly supervise, on April 9, 2019.

(xv)   On October 7, 2019, Florida Wellness, Gomez, and Kalin purported to provide at least 37 individual physical therapy services to at least to at least six individual Insureds, and falsely contended in the resulting bills to GEICO that Kalin personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 4.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. That same day, Kalin <u>also</u> purported to personally perform, or at least directly supervise: (a) two forty five minute initial patient examinations and two follow-up patient examinations, one forty-five minute initial patient examination, and two forty minute follow-up patient examinations; and (b) at least 125 <u>additional</u> physical therapy services purportedly provided to at least 19 <u>additional</u> GEICO Insureds at Personal Rehabilitation and Himes Clinic, including at least 15.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services. In all, GEICO received billing for at least 20 hours of services that Kalin purported to personally perform, or at least directly supervise, on October 7, 2019.

42.     These are only representative examples. It is improbable, to the point of impossibility, that Kalin – who was advanced in age at the time, and simultaneously working or purporting to work at various other medical practices and clinics – routinely performed or directly supervised such a massive volume of physical therapy services on individual dates, often at multiple of the Clinic Defendants on individual dates.

43.     Upon information and belief, the fraudulent billing for physical therapy services that the Defendants submitted or caused to be submitted through the respective Clinic Defendantgs to GEICO constituted only a fraction of the total fraudulent billing for physical therapy services that the Defendants submitted through these respective Clinic Defendants to all of the automobile insurers in the Florida automobile insurance market.

44.     It is extremely improbable, to the point of impossibility, that the Defendants only submitted fraudulent billing to GEICO, and that the Defendants did not simultaneously bill other automobile insurers.

45.     Thus, upon information and belief, the impossible number of physical therapy services that Kalin purported to directly supervise or perform for GEICO Insureds at Himes Clinic, Florida Wellness, Personal Rehabilitation, Ybor Medical, and Nova Diagnostics (among other locations) on individual dates of service constituted only a fraction of the total number of physical therapy services that Kalin purported

to directly supervise or perform at these respective Clinic Defendants, including for individuals insured by companies other than GEICO, on those same dates of service.

46.     In keeping with the fact that Kalin never supervised the business activities of Himes Clinic, and that Kalin, Brister, and Agdamag never legitimately fulfilled their required duties as "medical director" at the other respective Clinic Defendants, each of the claims submitted by Defendants for physical therapy services identified in Exhibits "1" – "5" falsely represented that Kalin had performed or at least directly supervised the underlying physical therapy services, so as to create the false appearance that the services were eligible for PIP reimbursement. In fact, the underlying physical therapy services were not eligible for PIP reimbursement, because they had been performed – to the extent they were performed at all – by completely unsupervised massage therapists and/or registered chiropractic assistants including: (i) Cabezas, Cabrera, Sosa, and Perez at Himes Clinic; (ii) Vazquez at Florida Wellness; (iii) Ugarte at Personal Rehabilitation (iv) Padron at Ybor Medical; and (v) De La Cruz and Ramos at Nova Diagnostics.

47.     In the claims for physical therapy services identified in Exhibits "1" – "5", the Defendants routinely fraudulently misrepresented that the physical therapy services were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

(i)     the putative physical therapy services were performed – to the extent they were performed at all – by massage therapists and/or registered chiropractic assistants, without any supervision by anyone;

23

(ii)    the respective Clinic Defendants could not lawfully recover PIP Benefits for the putative physical therapy services, because they were performed by completely unsupervised massage therapists and/or registered chiropractic assistants in contravention of Florida law; and

(iii)   the Defendants systematically fraudulently misrepresented that the physical therapy services were legitimately performed or supervised by Kalin.

**D.    The Defendants' Fraudulent Treatment and Billing Protocols**

48.    In the claims identified in Exhibits "1" – "5", virtually none of the Insureds whom the Defendants purported to treat suffered from any significant injuries or health problems as a result of the relatively minor accidents they experienced or purported to experience.

49.    Even so – and in keeping with the fact that Kalin never legitimately supervised Himes Clinic and Kalin, Brister, and Agdamag never legitimately served as medical director at any of the Clinic Defendants – the Defendants purported to subject virtually every Insured to a medically unnecessary course of "treatment" pursuant to pre-determined, fraudulent protocols designed to maximize the billing that they could submit to insurers, including GEICO, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

**1.    The Fraudulent Claims for Initial Examinations**

50.    As a first step in their fraudulent treatment and billing protocol, each of the Insureds in the claims identified in Exhibits "1" - "5" purportedly received an initial examination at the respective Clinic Defendants, with Kalin purporting to personally

perform or directly supervise a substantial majority of the initial examinations in the claims identified in Exhibit "1" – "5".

51.     The purported initial examinations then were billed to GEICO in the following manner:

(i)     In the claims identified in Exhibit "1", Himes Clinic and Kalin billed GEICO under CPT code 99204 for each initial examination that Kalin purportedly provided at Himes Clinic.

(ii)    In the claims identified in Exhibit "2", Florida Wellness, Gomez, and Kalin billed GEICO under CPT code 99204 for each initial examination that Kalin purportedly provided at Florida Wellness.

(iii)   In the claims identified in Exhibit "3", Personal Rehabilitation, Santos, and Kalin billed GEICO under CPT code 99204 for each initial examination that Kalin purportedly provided at Personal Rehabilitation.

(iv)    In the claims identified in Exhibit "4", Ybor Medical, Duncan, and Kalin billed GEICO under CPT code 99204 for each initial examination that Kalin, purportedly provided at Ybor Medical.

(v)     In the claims identified in Exhibit "5", Nova Diagnostics, Guerra, Brister, Agdamag, and Kalin billed GEICO under CPT code 99204 for each initial examination that Kalin purportedly provided at Nova Diagnostics.

52.     Pursuant to the American Medical Association's CPT Assistant, which governs reimbursement of PIP claims, the use of CPT code 99204 to bill for an initial patient examination represents – among other things – that: (i) the patient presented with problems of moderate to high severity; (ii) the physician who conducted the examination spent at least 45 minutes of face-to-face time with the patient or the patient's family during the examination; (iii) the physician who performed the examination conducted a "comprehensive" physical examination; and (iv) the

physician who performed the examination engaged in "moderate complexity" medical decision-making in connection with the examination.

53.    As set forth below, the charges for the initial examinations identified in Exhibits "1" - "5" were fraudulent in that they misrepresented the nature, extent, and results of the purported initial examinations.

**(i)    Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

54.    To the extent that the Insureds in the claims identified in Exhibits "1" - "5" had any presenting problems at all as the result of their typically-minor automobile accidents, the problems virtually always were low or minimal severity soft tissue injuries such as sprains and strains.

55.    For instance, in the vast majority of the claims identified in Exhibits "1" - "5" the Insureds did not seek treatment at any hospital as the result of their accidents. To the limited extent that the Insureds in the claims identified in Exhibits "1" - "5" did seek treatment at a hospital following their accidents, they virtually always were briefly observed on an outpatient basis, and discharged with nothing more serious than a minor soft tissue injury diagnosis.

56.    Furthermore, in the substantial majority of the claims identified in Exhibits "1" - "5", contemporaneous police reports indicated that the Insureds' vehicles were functional following the accidents, and that no one was seriously injured in the accidents, or injured at all.

57.     Even so, in the claims for initial examinations identified in Exhibits "1" -

"5", the respective Medical Director Defendants, Clinic Defendants, and Clinic Owner

Defendants billed GEICO for the putative initial examinations using CPT code 99204,

and thereby falsely represented that the Insureds presented with problems of

moderate to high severity. In fact, the Insureds' problems were low or minimal severity

soft tissue injuries such as sprains and strains, to the limited extent that they had any

presenting problems at all.

58.     For example:

(i)     On January 23, 2015, an Insured named AM was involved in an
        automobile accident. The contemporaneous police report indicated that
        there was minor damage to AM's vehicle, that there was minor damage
        to the other vehicle, that the airbags in AM's vehicle did not deploy, and
        that AM's vehicle was drivable following the accident.  The police report
        further indicated that AM was not injured in the accident. In keeping
        with the fact that AM was not seriously injured in the accident, AM did
        not visit any hospital emergency room following the accident. To the
        extent that AM experienced any health problems at all as the result of
        the accident, they were of low or minimal severity. Even so, following a
        purported initial examination of AM by Kalin on January 29, 2015,
        Personal Rehabilitation, Santos, and Kalin billed GEICO for the initial
        examination using CPT code 99204, and thereby falsely represented that
        AM presented with moderately to highly severe health problems as the
        result of the accident.

(ii)    On May 2, 2015, an Insured named NB was involved in an automobile
        accident. The contemporaneous police report indicated that the accident
        was a rear-end collision, that  the airbags in NB's vehicle did not deploy,
        and that NB's vehicle was drivable following the accident.  The police
        report further indicated that NB was not injured in the accident. In
        keeping with the fact that NB was not seriously injured in the accident,
        NB did not visit any hospital emergency room following the accident. To
        the extent that NB experienced any health problems at all as the result
        of the accident, they were of low or minimal severity. Even so, following
        a purported initial examination of NB by Kalin on May 13, 2015, Ybor

Medical, Duncan, and Kalin billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that NB presented with moderately to highly severe health problems as the result of the accident.

(iii)    On August 12, 2017, an Insured named JG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, that the airbags in JG's vehicle did not deploy, and that JG's vehicle was drivable following the accident. The police report further indicated that JG was not injured in the accident. In keeping with the fact that JG was not seriously injured in the accident, JG did not visit any hospital emergency room following the accident. To the extent that JG experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of JG by Kalin on November 14, 2017, Ybor Medical, Duncan, and Kalin billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that JG presented with moderately to highly severe health problems as the result of the accident.

(iv)    On August 24, 2017, an Insured named SG was involved in an automobile accident. The contemporaneous police report indicated there was minor damage to SG's vehicle, that the airbags in SG's vehicle did not deploy, and that SG's vehicle was drivable following the accident.  The police report further indicated that SG was not injured in the accident. In keeping with the fact that SG was not seriously injured in the accident, SG did not visit any hospital emergency room following the accident. To the extent that SG experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of SG by Kalin on September 5, 2017, Nova Diagnostics, Guerra, Brister, and Kalin billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that SG presented with moderately to highly severe health problems as the result of the accident.

(v)    On November 25, 2017, an Insured named MJ was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to MJ's vehicle, that the airbags in MJ's vehicle did not deploy, and that MJ's vehicle was drivable following the accident. The police report further indicated that MJ was not injured in the accident. In keeping with the fact that MJ was not seriously injured in the accident, MJ did not visit any hospital emergency room following the

accident. To the extent that MJ experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of MJ by Kalin on November 27, 2017, Personal Rehabilitation, Santos, and Kalin billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that MJ presented with moderately to highly severe health problems as the result of the accident.

(vi)     On June 6, 2018, an Insured named JG was involved in an automobile accident. The contemporaneous police report indicated there was minor damage to JG's vehicle, that there was minor damage to the other vehicle, that the airbags in JG's vehicle did not deploy, and that JG's vehicle was drivable following the accident.  The police report further indicated that JG was not injured in the accident. In keeping with the fact that JG was not seriously injured in the accident, JG did not visit any hospital emergency room following the accident.  To the extent that JG experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of JG by Kalin on June 14, 2018, Nova Diagnostics, Guerra, Agdamag, and Kalin billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that JG presented with moderately to highly severe health problems as the result of the accident.

(vii)    On August 10, 2018, an Insured named MR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, that there was minor damage to MR's vehicle, that the airbags in MR's vehicle did not deploy, and that MR's vehicle was drivable following the accident.  The police report further indicated that MR was not injured in the accident. In keeping with the fact that MR was not seriously injured in the accident, MR did not visit any hospital emergency room following the accident. To the extent that MR experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of MR by Kalin on August 21, 2018, Florida Wellness, Gomez, and Kalin billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that MR presented with moderately to highly severe health problems as the result of the accident.

(viii)   On February 1, 2019, an Insured named YR was involved in an automobile accident. The contemporaneous police report indicated that

the accident was a rear-end collision, that there was minor damage to YR's vehicle, that there was no damage to the other vehicle, that the airbags in YR's vehicle did not deploy, and that YR's vehicle was drivable following the accident.  The police report further indicated that YR was not injured in the accident. In keeping with the fact that YR was not seriously injured in the accident, YR did not visit any hospital emergency room following the accident. To the extent that YR experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of YR by Kalin on February 4, 2019, Himes Clinic and Kalin billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that YR presented with moderately to highly severe health problems as the result of the accident.

(ix)  On June 11, 2019, an Insured named MG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, that there was minor damage to MG's vehicle, that there was minor damage to the other vehicle, that the airbags in MG's vehicle did not deploy, and that MG's vehicle was drivable following the accident.  The police report further indicated that MG was not injured in the accident. In keeping with the fact that MG was not seriously injured in the accident, MG did not visit any hospital emergency room following the accident. To the extent that MG experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of MG by Kalin on June 13, 2019, Himes Clinic and Kalin billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that MG presented with moderately to highly severe health problems as the result of the accident.

(x)  On February 29, 2020, an Insured named RQ was involved in an automobile accident. The contemporaneous police report indicated that the accident involved a rear-end collision, that the airbags in RQ's vehicle did not deploy, and that RQ's vehicle was drivable following the accident.  The police report further indicated that RQ was not injured in the accident. In keeping with the fact that RQ was not seriously injured in the accident, RQ did not visit any hospital emergency room following the accident. To the extent that RQ experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of RQ by Kalin on March 3, 2020, Florida Wellness, Gomez, and Kalin billed GEICO for the initial examination using CPT code 99204, and thereby falsely

represented that RQ presented with moderately to highly severe health problems as the result of the accident.

59.    These are only representative examples. In the claims for initial examinations identified in Exhibits "1" - "5", the respective Medical Director Defendants, Clinic Defendants, and Clinic Owner Defendants virtually always falsely represented that the Insureds presented with problems of moderate to high severity in order to: (i) create a false basis for their charges for the examinations under CPT code 99204, because examinations billable under CPT code 99204 are reimbursable at a higher rate than examinations involving presenting problems of low severity, minimal severity, or no severity; and (ii) create a false basis for the laundry list of other Fraudulent Services that the Defendants purported to provide to the Insureds.

(ii)    **Misrepresentations Regarding "Comprehensive" Physical Examinations**

60.    In addition, in the claims for initial examinations identified in Exhibits "1" - "5", when the respective Medical Director Defendants, Clinic Defendants, and Clinic Owner Defendants billed GEICO for the putative initial examinations using CPT code 99204, they falsely represented that the physician who purported to conduct the examinations – namely Kalin – conducted "comprehensive" physical examinations of the Insureds who purportedly received the examinations.

61.    In fact, with respect to the claims for initial examinations under CPT code 99204 that are identified in Exhibits "1" – "5", neither Kalin nor any other physician or healthcare provider associated with the Clinic Defendants ever conducted a "comprehensive" patient examination because: (i) pursuant to the CPT Assistant, a

31

"comprehensive" physical examination requires – among other things – that the physician performing the examination document a general examination of multiple patient organ systems or a complete examination of a single patient organ system; but (ii) neither Kalin, nor any other physician associated with the Clinic Defendants, ever documented a general examination of multiple patient organ systems or a complete examination of a single patient organ system.

62. For example:

(i) On January 3, 2017, Florida Wellness, Gomez, and Kalin billed GEICO under CPT code 99204 for an initial examination that Kalin purported to perform or supervise on an Insured named MR, and thereby represented that they had provided a "comprehensive" physical examination to MR. However, Kalin did not document findings with respect to at least eight of the Insured's organ systems, nor did he document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(ii) On August 18, 2017, Ybor Medical, Duncan, and Kalin billed GEICO under CPT code 99204 for an initial examination that Kalin purported to perform or supervise on an Insured named MR, and thereby represented that they had provided a "comprehensive" physical examination to MR. However, Kalin did not document findings with respect to at least eight of the Insured's organ systems, nor did he document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(iii) On November 2, 2017, Florida Wellness, Gomez, and Kalin billed GEICO under CPT code 99204 for an initial examination that Kalin purported to perform or supervise on an Insured named JJ, and thereby represented that they had provided a "comprehensive" physical examination to JJ. However, Kalin did not document findings with respect to at least eight of the Insured's organ systems, nor did he document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(iv) On September 5, 2017, Nova Diagnostics, Guerra, Brister, and Kalin

billed GEICO under CPT code 99204 for an initial examination that Kalin purported to perform or supervise on an Insured named SG, and thereby represented that they had provided a "comprehensive" physical examination to SG.  However, Kalin did not document findings with respect to at least eight of the Insured's organ systems, nor did he document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(v)     On March 27, 2018, Nova Diagnostics, Guerra, Agdamag, and Kalin billed GEICO under CPT code 99204 for an initial examination that Kalin purported to perform or supervise on an Insured named RF, and thereby represented that they had provided a "comprehensive" physical examination to RF.  However, Kalin did not document findings with respect to at least eight of the Insured's organ systems, nor did he document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(vi)    On November 14, 2018, Personal Rehabilitation, Santos, and Kalin billed GEICO under CPT code 99204 for an initial examination that Kalin purported to perform or supervise on an Insured named GG, and thereby represented that they had provided a "comprehensive" physical examination to GG.  However, Kalin did not document findings with respect to at least eight of the Insured's organ systems, nor did he document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(vii)   On February 4, 2019, Himes Clinic and Kalin billed GEICO under CPT code 99204 for an initial examination that Kalin purported to perform or supervise on an Insured named YR, and thereby represented that they had provided a "comprehensive" physical examination to YR.  However, Kalin did not document findings with respect to at least eight of the Insured's organ systems, nor did he document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(viii)  On June 13, 2019, Himes Clinic and Kalin billed GEICO under CPT code 99204 for an initial examination that Kalin purported to perform or supervise on an Insured named MG, and thereby represented that they had provided a "comprehensive" physical examination to MG.  However, Kalin did not document findings with respect to at least eight of the Insured's organ systems, nor did he document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other

organ systems.

(ix)  On December 3, 2019, Ybor Medical, Duncan, and Kalin billed GEICO under CPT code 99204 for an initial examination that Kalin purported to perform or supervise on an Insured named JV, and thereby represented that they had provided a "comprehensive" physical examination to JV. However, Kalin did not document findings with respect to at least eight of the Insured's organ systems, nor did he document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(x)  On February 10, 2020, Personal Rehabilitation, Santos, and Kalin billed GEICO under CPT code 99204 for an initial examination that Kalin purported to perform or supervise on an Insured named JG, and thereby represented that they had provided a "comprehensive" physical examination to JG.  However, Kalin did not document findings with respect to at least eight of the Insured's organ systems, nor did he document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

63.    These are only representative examples. In the claims for initial examinations identified in Exhibits "1" - "5", the respective Medical Director Defendants, Clinic Defendants, and Clinic Owner Defendants routinely falsely represented that they provided "comprehensive" physical examinations to the Insureds in order to create a false basis for their charges for the examinations under CPT code 99204, because examinations billable under CPT code 99204 are reimbursable at  higher rates than examinations that are not "comprehensive".

(iii)   **Misrepresentations Regarding the Extent of Medical Decision-Making**

64.    Moreover, in the claims for initial examinations identified in Exhibits "1" - "5", when the Medical Director Defendants, Clinic Defendants, and Clinic Owner Defendants billed GEICO for putative initial examinations using CPT code 99204, they

falsely represented that the physician who purported to conduct the examinations – namely Kalin – engaged in some legitimate, moderate complexity medical decision-making in connection with the examinations.

65.   In actuality, the purported initial examinations did not involve any legitimate medical decision-making at all.

66.   For instance, in the claims for initial examinations identified in Exhibits "1" - "5": (i) the initial examinations did not involve the retrieval, review, or analysis of any meaningful amount of medical records, diagnostic tests, or other information; (ii) there was no risk of significant complications or morbidity – much less mortality – from the Insureds' minor soft-tissue injury complaints, to the extent that they ever had any complaints arising from automobile accidents at all; and (iii) Kalin did not consider any significant number of diagnoses or treatment options for Insureds during the initial examinations, and instead – at the direction of the respective Clinic Defendants and Clinic Owner Defendants – falsely diagnosed virtually every Insured as having an "emergency medical condition" and provided a nearly identical, pre-determined sprain/strain or similar soft tissue injury "diagnosis" for every Insured.

67.   For example:

(i)   On January 23, 2015, an Insured named AM was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to AM's vehicle, that there was minor damage to the other vehicle, that the airbags in AM's vehicle did not deploy, and that AM's vehicle was drivable following the accident.  The police report further indicated that AM was not injured in the accident. In keeping with the fact that AM was not seriously injured in the accident, AM did not visit any hospital emergency room following the accident. To the

extent that AM experienced any health problems at all as the result of the accident, they were of low severity. On January 29, 2015, Kalin purported to conduct an initial examination of AM at Personal Rehabilitation. To the extent that Kalin performed the examination in the first instance, Kalin did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Kalin did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Kalin provided AM with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither AM's presenting problems, nor the treatment plan provided to AM by Kalin, Santos, and Personal Rehabilitation, presented any risk of significant complications, morbidity, or mortality. To the contrary, AM did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Kalin, Santos, and Personal Rehabilitation consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to AM. Even so, Kalin, Santos, and Personal Rehabilitation billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Kalin engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(ii)     On May 12, 2016, an Insured named JD was involved in an automobile accident. The contemporaneous police report indicated that the airbags in JD's vehicle did not deploy, and that JD's vehicle was drivable following the accident.  The police report further indicated that JD was not injured in the accident. In keeping with the fact that JD was not seriously injured in the accident, JD did not visit any hospital emergency room following the accident. To the extent that JD experienced any health problems at all as the result of the accident, they were of low severity. On May 16, 2016, Kalin purported to conduct an initial examination of JD at Florida Wellness. To the extent that Kalin performed the examination in the first instance, Kalin did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Kalin did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Kalin provided JD with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither JD's presenting problems, nor the treatment plan provided to JD by Kalin, Gomez, and Florida Wellness, presented any risk of significant

complications, morbidity, or mortality. To the contrary, JD did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Kalin, Gomez, and Florida Wellness consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to JD. Even so, Kalin, Gomez, and Florida Wellness billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Kalin engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(iii)   On August 12, 2017, an Insured named JG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, that the airbags in JG's vehicle did not deploy, and that JG's vehicle was drivable following the accident. The police report further indicated that JG was not injured in the accident. In keeping with the fact that JG was not seriously injured in the accident, JG did not visit any hospital emergency room following the accident. To the extent that JG experienced any health problems at all as the result of the accident, they were of low severity. On November 14, 2017 Kalin purported to conduct an initial examination of JG at Ybor Medical. To the extent that Kalin performed the examination in the first instance, Kalin did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Kalin did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Kalin provided JG with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither JG's presenting problems, nor the treatment plan provided to JG by Kalin, Duncan, and Ybor Medical, presented any risk of significant complications, morbidity, or mortality. To the contrary, JG did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Kalin, Duncan, and Ybor Medical consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to JG. Even so, Kalin, Duncan, and Ybor Medical billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Kalin engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(iv)   On September 20, 2017, an Insured named LC was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to LC's vehicle, that there was minor damage

to the other vehicle, that the airbags in LC's vehicle did not deploy, and that LC's vehicle was drivable following the accident.  The police report further indicated that LC was not injured in the accident. In keeping with the fact that LC was not seriously injured in the accident, LC did not visit any hospital emergency room following the accident. To the extent that LC experienced any health problems at all as the result of the accident, they were of low severity. On September 22, 2017, Kalin purported to conduct an initial examination of LC at Nova Diagnostics. To the extent that Kalin performed the examination in the first instance, Kalin did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Kalin did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Kalin provided LC with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither LC's presenting problems, nor the treatment plan provided to LC by Nova Diagnostics, Guerra, Brister, and Kalin, presented any risk of significant complications, morbidity, or mortality. To the contrary, LC did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Nova Diagnostics, Guerra, Brister, and Kalin consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to LC. Even so, Nova Diagnostics, Guerra, Brister, and Kalin billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Kalin engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(v) On March 22, 2018, an Insured named DG was involved in an automobile accident. The contemporaneous police report indicated there was minor damage to DG's vehicle, that the airbags in DG's vehicle did not deploy, and that DG's vehicle was drivable following the accident.  The police report further indicated that DG was not seriously injured in the accident. In keeping with the fact that DG was not seriously injured in the accident, DG did not visit any hospital emergency room following the accident. To the extent that DG experienced any health problems at all as the result of the accident, they were of low severity. On March 26, 2018, Kalin purported to conduct an initial examination of DG at Nova Diagnostics. To the extent that Kalin performed the examination in the first instance, Kalin did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Kalin did not consider any significant number of diagnoses or management options in connection

with the examination. Instead, Kalin provided DG with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither DG's presenting problems, nor the treatment plan provided to DG by Nova Diagnostics, Guerra, Agdamag, and Kalin, presented any risk of significant complications, morbidity, or mortality. To the contrary, DG did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Nova Diagnostics, Guerra, Agdamag, and Kalin consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to DG. Even so, Nova Diagnostics, Guerra, Agdamag, and Kalin billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Kalin engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(vi) On May 8, 2018, an Insured named JM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, that there was minor damage to JM's vehicle, that the airbags in JM's vehicle did not deploy, and that JM's vehicle was drivable following the accident.  .  The police report further indicated that JM was not injured in the accident. In keeping with the fact that JM was not seriously injured in the accident, JM did not visit any hospital emergency room following the accident. To the extent that JM experienced any health problems at all as the result of the accident, they were of low severity. On May 14, 2018, Kalin purported to conduct an initial examination of JM at Himes Clinic. To the extent that Kalin performed the examination in the first instance, Kalin did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Kalin did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Kalin provided JM with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither JM's presenting problems, nor the treatment plan provided to JM by Himes Clinic and Kalin, presented any risk of significant complications, morbidity, or mortality. To the contrary, JM did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Himes Clinic and Kalin consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to JM. Even so, Himes Clinic and Kalin billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Kalin engaged in some legitimate, moderate complexity medical decision-

making during the purported examination.

(vii)   On February 27, 2019, an Insured named PM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, that the airbags in PM's vehicle did not deploy, and that PM's vehicle was drivable following the accident. The police report further indicated that PM was not injured in the accident. In keeping with the fact that PM was not seriously injured in the accident, PM did not visit any hospital emergency room following the accident. To the extent that PM experienced any health problems at all as the result of the accident, they were of low severity. On March 5, 2019, Kalin purported to conduct an initial examination of PM at Himes Clinic. To the extent that Kalin performed the examination in the first instance, Kalin did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Kalin did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Kalin provided PM with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither PM's presenting problems, nor the treatment plan provided to PM by Himes Clinic and Kalin, presented any risk of significant complications, morbidity, or mortality. To the contrary, PM did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Himes Clinic and Kalin consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to PM. Even so, Himes Clinic and Kalin billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Kalin engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(viii)  On November 25, 2019, an Insured named JV was involved in an automobile accident. The contemporaneous police report indicated that the accident that  the airbags in JV's vehicle did not deploy. The police report further indicated that JV was not injured in the accident. In keeping with the fact that JV was not seriously injured in the accident, JV did not visit any hospital emergency room following the accident. To the extent that JV experienced any health problems at all as the result of the accident, they were of low severity. On December 3, 2019, Kalin purported to conduct an initial examination of JV at Ybor Medical. To the extent that Kalin performed the examination in the first instance, Kalin did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the

examination. Moreover, Kalin did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Kalin provided JV with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither JV's presenting problems, nor the treatment plan provided to JV by Kalin, Duncan, and Ybor Medical, presented any risk of significant complications, morbidity, or mortality. To the contrary, JV did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Kalin, Duncan, and Ybor Medical consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to JV. Even so, Kalin, Duncan, and Ybor Medical billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Kalin engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(ix)  On February 11, 2020, an Insured named WV was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, and that the airbags in WV's vehicle did not deploy. The police report further indicated that WV was not injured in the accident. In keeping with the fact that WV was not seriously injured in the accident, WV did not visit any hospital emergency room following the accident. To the extent that WV experienced any health problems at all as the result of the accident, they were of low severity. On February 13, 2020, Kalin purported to conduct an initial examination of WV at Personal Rehabilitation. To the extent that Kalin performed the examination in the first instance, Kalin did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Kalin did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Kalin provided WV with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither WV's presenting problems, nor the treatment plan provided to WV by Kalin, Santos, and Personal Rehabilitation, presented any risk of significant complications, morbidity, or mortality. To the contrary, WV did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Kalin, Santos, and Personal Rehabilitation consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to WV. Even so, Kalin, Santos, and Personal Rehabilitation billed GEICO for the initial examination using CPT code 99204, and

thereby falsely represented that Kalin engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(x)    On February 29, 2020, an Insured named RQ was involved in an automobile accident. The contemporaneous police report indicated that the accident involved a rear-end collision, that the airbags in RQ's vehicle did not deploy, and that RQ's vehicle was drivable following the accident. The police report further indicated that RQ was not injured in the accident. In keeping with the fact that RQ was not seriously injured in the accident, RQ did not visit any hospital emergency room following the accident. To the extent that RQ experienced any health problems at all as the result of the accident, they were of low severity. On March 3, 2020, Kalin purported to conduct an initial examination of RQ at Florida Wellness. To the extent that Kalin performed the examination in the first instance, Kalin did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Kalin did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Kalin provided RQ with the same, phony, list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither RQ's presenting problems, nor the treatment plan provided to RQ by Kalin, Gomez, and Florida Wellness, presented any risk of significant complications, morbidity, or mortality. To the contrary, RQ did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Kalin, Gomez, and Florida Wellness consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to RQ. Even so, Kalin, Gomez, and Florida Wellness billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Kalin engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

68.    In keeping with the fact that these putative "diagnoses" were pre-determined and phony, Kalin – at the direction of the respective Clinic Defendants and Clinic Owner Defendants – frequently issued substantially identical, phony "diagnoses", on or about the same date, to two or more insureds who had been involved in a the same underlying accident, and recommended a substantially identical course of

medically unnecessary "treatment" to the Insureds, despite the fact that they were differently situated.

69.    For example:

(i)    On January 14, 2016, four Insureds – MT, LT, MT, and CT – were purportedly involved in the same automobile accident. Thereafter – incredibly – MT, LT, MT, and CT all presented at Personal Rehabilitation for initial examinations on the <u>exact same date</u>, January 20, 2016. MT, LT, MT, and CT were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that MT, LT, MT, and CT suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Personal Rehabilitation and Kalin – at the direction of Santos – provided MT, LT, MT, and CT with substantially identical, phony "diagnoses", and recommended a substantially identical course of medically unnecessary physical therapy treatment to all of them.

(ii)    On December 28, 2016, four Insureds – CR, MR, JR, and MR – were purportedly involved in the same automobile accident. Thereafter – incredibly – CR, MR, JR, and MR all presented at Florida Wellness for initial examinations on the <u>exact same date</u>, January 3, 2017. CR, MR, JR, and MR were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that CR, MR, JR, and MR suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Florida Wellness and Kalin – at the direction of Gomez – provided CR, MR, JR, and MR with substantially identical, phony "diagnoses", and recommended a substantially identical course of medically unnecessary physical therapy treatment to all of them.

(iii)    On May 23, 2017, two Insureds – MD and JR – were purportedly involved in the same automobile accident. Thereafter – incredibly – MD and JR both presented at Nova Diagnostics for initial examinations on the <u>exact same date</u>, June 6, 2017. MD and JR were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that MD and JR suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial

examinations, Nova Diagnostics, Guerra, Brister, and Kalin provided MD and JR with substantially identical, phony "diagnoses", and recommended a substantially identical course of medically unnecessary physical therapy treatment to both of them.

(iv)     On August 10, 2017, two Insureds – MR and CR – were purportedly involved in the same automobile accident. Thereafter – incredibly – MR and CR both presented at Ybor Medical for initial examinations on the <u>exact same date</u>, August 18, 2017. MR and CR were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that MR and CR suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Ybor Medical and Kalin – at the direction of Duncan – provided MR and CR with substantially identical, phony "diagnoses", and recommended a substantially identical course of medically unnecessary physical therapy treatment to both of them.

(v)      On October 28, 2017, two Insureds – JW and HW – were purportedly involved in the same automobile accident. Thereafter – incredibly – JW and HW both presented at Ybor Medical for initial examinations on the <u>exact same date</u>, November 8, 2017. JW and HW were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that JW and HW suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Ybor Medical and Kalin – at the direction of Duncan – provided JW and HW with substantially identical, phony "diagnoses", and recommended a substantially identical course of medically unnecessary physical therapy treatment to both of them.

(vi)     On December 18, 2017, three Insureds – ER, MS, and JS – were purportedly involved in the same automobile accident. Thereafter – incredibly – ER, MS, and JS all presented at Nova Diagnostics for initial examinations on the <u>exact same date</u>, December 20, 2017. ER, MS, and JS were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that ER, MS, and JS suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Nova Diagnostics, Guerra, Agdamag, and Kalin provided ER, MS, and JS with substantially identical, phony "diagnoses", and recommended a

44

substantially identical course of medically unnecessary physical therapy treatment to all of them.

(vii)  On December 5, 2018, three Insureds – EP, CR, and IR – were purportedly involved in the same automobile accident. Thereafter – incredibly – EP, CR, and IR all presented at Himes Clinic for initial examinations on the <u>exact same date</u>, December 7, 2018. EP, CR, and IR were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that EP, CR, and IR suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Himes Clinic and Kalin provided EP, CR, and IR with substantially identical, phony "diagnoses", and recommended a substantially identical course of medically unnecessary physical therapy treatment to all of them.

(viii)  On April 22, 2019, two Insureds – AF and EP – were purportedly involved in the same automobile accident. Thereafter – incredibly – AF and EP both presented at Personal Rehabilitation for initial examinations on the <u>exact same date</u>, April 23, 2019. AF and EP were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that AF and EP suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Personal Rehabilitation and Kalin – at the direction of Santos – provided AF and EP with substantially identical, phony "Diagnoses", and recommended a substantially identical course of medically unnecessary physical therapy treatment to both of them.

(ix)  On February 9, 2019, three Insureds – KR, YM, and OR – were purportedly involved in the same automobile accident. Thereafter – incredibly – KR, YM, and OR all presented at Himes Clinic for initial examinations on the <u>exact same date</u>, December 7, 2018. KR, YM, and OR were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that KR, YM, and OR suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Himes Clinic and Kalin provided KR, YM, and OR with substantially identical, phony "diagnoses", and recommended a substantially identical course of medically unnecessary physical therapy treatment to all of them.

(x)   On February 3, 2020, two Insureds – GE and CR – were purportedly involved in the same automobile accident. Thereafter – incredibly – GE and CR both presented at Florida Wellness for initial examinations on the <u>exact same date</u>, February 10, 2020. GE and CR were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that GE and CR suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Florida Wellness and Kalin – at the direction of Gomez – provided GE and CR with substantially identical, phony "diagnoses", and recommended a substantially identical course of medically unnecessary physical therapy treatment to both of them.

70.   Based on these phony and pre-determined soft tissue injury "diagnoses", the vast majority of the Insureds in the claims identified in Exhibits "1" – "5" were directed to return to one of the Clinic Defendants for medically unnecessary "physical therapy", which was performed – to the extent that it was performed at all – by completely unsupervised massage therapists and/or registered chiropractic assistants including: (i) Cabezas, Cabrera, Sosa, and, Perez at Himes Clinic; (ii) Vazquez at Florida Wellness; (iii) Ugarte at Personal Rehabilitation (iv) Padron at Ybor Medical; and (v) De La Cruz and Ramos at Nova Diagnostics.

71.   The false "diagnoses" contained within the initial examination reports were included to give the false impression that the initial examinations entailed some legitimate medical decision-making, to create a false basis for the charges under CPT code 99204, and to create a false justification for the other Fraudulent Services that the Defendants purported to provide to the Insureds.

72.     In the claims for initial examinations identified in Exhibits "1" – "5", the respective Medical Director Defendants, Clinic Defendants, and Clinic Owner Defendants routinely fraudulently misrepresented that the examinations were lawfully provided and eligible for PIP reimbursement, when in fact they were neither lawfully provided nor reimbursable, because:

(i)     the putative examinations were illusory, with outcomes that were pre-determined to result in substantially-identical, phony "diagnoses" and treatment recommendations, regardless of the Insureds' true individual circumstances and presentation;

(ii)    the charges for the putative examinations misrepresented the nature and extent of the examinations;

(iii)   Himes Clinic never was eligible to collect PIP Benefits in connection with the examinations in the first instance, inasmuch as it was operated in violation of the Clinic Act; and

(iv)    Florida Wellness, Personal Rehabilitation, Ybor Medical, and Nova Diagnostics never were eligible to collect PIP Benefits in connection with the examinations in the first instance, inasmuch as they unlawfully were operated without legitimate medical directors.

73.     In this context, Kalin – who at all relevant times purported to own Himes Clinic – did not, and could not have, legitimately supervised the business activities of Himes Clinic

74.     Had Kalin actually supervised the business activities of Himes Clinic, Kalin would have noted – among other things – that Himes Clinic's billing routinely fraudulently misrepresented that the putative initial examinations were legitimately and lawfully performed.

75.     Kalin failed to do so, because he never actually supervised the business activities of Himes Clinic.

76.     Similarly, Kalin – who at all relevant times purported to serve as the "medical director" at Florida Wellness, Personal Rehabilitation, and Ybor Medical – did not, and could not have, "[c]onduct[ed] systematic reviews of clinic billings to ensure that the billings are not fraudulent or unlawful." <u>See</u> Fla. Stat. § 400.9935(1). Had Kalin done so, he would have observed and put a stop to these fraudulent charges for initial examinations.

77.     Likewise, Brister, and Agdamag – who both purported to serve as the "medical director" at Nova Diagnostics did not, and could not have, "[c]onduct[ed] systematic reviews of clinic billings to ensure that the billings are not fraudulent or unlawful." <u>See</u> Fla. Stat. § 400.9935(1). Had Brister and Agdamag done so, they would have observed and put a stop to these fraudulent charges for initial examinations.

## 2.     The Fraudulent Charges for Follow-Up Examinations

78.     In addition to the fraudulent initial examinations, most of the Insureds in the claims identified in Exhibits "1" - "5" purportedly received multiple, fraudulent follow-up examinations at the respective Clinic Defendants, with:

(i)     Kalin and a chiropractor named Brock Mathieson ("Mathieson") purporting to personally perform or directly supervise virtually all of the follow-up examinations at Himes Clinic; and

(ii)    Kalin purporting to personally perform or directly supervise virtually all of the follow-up examinations at Florida Wellness, Personal Rehabilitation, Ybor Medical, and Nova Diagnostics.

79.     The purported follow-up examinations then were billed to GEICO in the following manner:

(i)      In the claims identified in Exhibit "1", Himes Clinic and Kalin typically billed GEICO under CPT code 99213 for the follow-up examinations that Kalin and Mathieson purportedly provided at Himes Clinic.

(ii)     In the claims identified in Exhibit "2", Florida Wellness, Gomez, and Kalin typically billed GEICO under CPT code 99215 for the follow-up examinations that Kalin purportedly provided at Florida Wellness.

(iii)    In the claims identified in Exhibit "3", Personal Rehabilitation, Santos, and Kalin typically billed GEICO under CPT code 99215 for the follow-up examinations that Kalin purportedly provided at Personal Rehabilitation.

(iv)     In the claims identified in Exhibit "4", Ybor Medical, Duncan, and Kalin typically billed GEICO under CPT code 99215 for the follow-up examinations that Kalin purportedly provided at Ybor Medical.

(v)      In the claims identified in Exhibit "5", Nova Diagnostics, Guerra, Brister, Agdamag, and Kalin typically billed GEICO under CPT codes 99213 and 99215 for the follow-up examinations that Kalin purportedly provided at Nova Diagnostics.

80.     Pursuant to the CPT Assistant, the use of CPT code 99213 to bill for a follow-up examination represents – among other things – that: (i) the patient presented with problems of low to moderate severity; and (ii) the physician performed at least two of the following three components during the examination: (a) took an "expanded problem focused" patient history; (b) conducted an "expanded problem focused physical examination"; and (c) engaged in medical decision-making of "low complexity".

81.     Pursuant to the CPT Assistant, the use of CPT code 99215 to bill for a follow-up examination represents – among other things – that: (i) the patient

49

presented with problems of moderate to high severity; and (ii) the physician performed at least two of the following three components during the examination: (a) took a "comprehensive" patient history; (b) conducted a "comprehensive" physical examination; and (c) engaged in medical decision-making of "high complexity".

82.     As set forth below, the charges for the follow-up examinations identified in Exhibits "1" – "5" misrepresented the nature, extent, and results of the follow-up examinations.

**(i)     Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

83.     To the extent that the Insureds in the claims identified in Exhibits "1" - "5" suffered any injuries at all in their automobile accidents, the injuries almost always were minor soft tissue injuries such as sprains and strains, which were of low or minimal severity, even at their onset.

84.     Minor soft tissue injuries such as strains and sprains virtually always resolve after a short course of conservative treatment or no treatment at all. By the time the Insureds in the claims identified in Exhibits "1" - "5" presented for their putative follow-up examinations – typically weeks or months after their typically minor accidents – the Insureds either did not have any genuine presenting problems at all as the result of their minor automobile accidents, or else their presenting problems were minimal.

85.   Even so, in the claims for the follow-up examinations identified in Exhibits "1" - "5", the Medical Director Defendants, the Clinic Defendants, and the Clinic Owner Defendants, made the following misrepresentations:

(i)   When billing GEICO for putative follow-up examinations using CPT code 99213 in the claims identified in Exhibits "1" and "5", Himes Clinic, Nova Diagnostics, Guerra, Brister, Agdamag, and Kalin falsely represented that the Insureds presented with problems of low to moderate severity, when in fact the Insureds' problems were minimal severity soft tissue injuries such as sprains and strains, to the limited extent that they had any presenting problems at all.

(ii)   When billing GEICO for putative follow-up examinations using CPT code 99215 in the claims identified in Exhibits "2" – "5", the Medical Director Defendants, Florida Wellness, Gomez, Personal Rehabilitation, Santos, Ybor Medical, Duncan, Nova Diagnostics, and Guerra falsely represented that the Insureds presented with problems of moderate to high severity, when in fact the Insureds' problems were minimal severity soft tissue injuries such as sprains and strains, to the limited extent that they had any presenting problems at all.

86.   For example:

(i)   On August 5, 2016, an Insured named SA was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, that there was minor damage to SA's vehicle, that the airbags in SA's vehicle did not deploy, and that SA's vehicle was drivable following the accident.  The police report further indicated that SA was not injured in the accident. In keeping with the fact that SA was not seriously injured in the accident, SA did not visit any hospital emergency room following the accident. To the extent that SA experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had resolved or were minimal within a few weeks of the accident. Even so, following purported follow-up examinations of SA by Mathieson on September 28, 2016 and November 23, 2016, Himes Clinic, Kalin, and Mathieson billed GEICO for the follow-up examinations using CPT code 99213 and thereby falsely represented that SA presented with problems of low to moderate severity.

(ii)     On January 11, 2017, an Insured named RC was involved in an automobile accident. The contemporaneous police report indicated that the airbags in RC's vehicle did not deploy. The police report further indicated that RC was not injured in the accident. In keeping with the fact that RC was not seriously injured in the accident, RC did not visit any hospital emergency room following the accident. To the extent that RC experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had resolved or were minimal within a few weeks of the accident. Even so, following purported follow-up examination of RC by Kalin on March 21, 2017, Personal Rehabilitation, Santos, and Kalin billed GEICO for the follow-up examination using CPT code 99215 and thereby falsely represented that RC presented with problems of moderate to high severity. What is more, following an additional purported follow-up examination of RC by Kalin on May 8, 2017, Personal Rehabilitation, Santos, and Kalin billed GEICO for an additional follow-up examination using CPT code 99215 and thereby falsely represented that RC again presented with problems of moderate to high severity. In keeping with the fact that RC had no presenting problems of moderate to high severity, Personal Rehabilitation, Santos, and Kalin actually stopped treating RC after May 8, 2017.

(iii)    On September 20, 2017, an Insured named LC was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to LC's vehicle, that there was minor damage to the other vehicle, that the airbags in LC's vehicle did not deploy, and that LC's vehicle was drivable following the accident.  The police report further indicated that LC was not injured in the accident. In keeping with the fact that LC was not seriously injured in the accident, LC did not visit any hospital emergency room following the accident. To the extent that LC experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had resolved or were minimal within a few weeks of the accident. Even so, following purported follow-up examination of LC by Kalin on November 29, 2017, Nova Diagnostics, Guerra, Agdamag, and Kalin billed GEICO for the follow-up examination using CPT code 99213 and thereby falsely represented that LC presented with problems of low to moderate severity. What is more, following an additional purported follow-up examination of LC by Kalin on January 2, 2018, Nova Diagnostics, Guerra, Agdamag, and Kalin billed GEICO for an additional follow-up examination using CPT code 99215 and thereby falsely represented that LC presented with problems of moderate to high severity. In keeping

with the fact that LC had no presenting problems of moderate to high severity, Nova Diagnostics, Guerra, Agdamag, and Kalin actually stopped treating LC after January 2, 2018.

(iv)    On September 29, 2017, an Insured named JS was involved in an automobile accident. The contemporaneous police report indicated that the airbags in JS's vehicle did not deploy. The police report further indicated that JS was not injured in the accident. In keeping with the fact that JS was not seriously injured in the accident, JS did not visit any hospital emergency room following the accident. To the extent that JS experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had resolved or were minimal within a few weeks of the accident. Even so, following purported follow-up examination of JS by Kalin on December 27, 2017, Nova Diagnostics, Guerra, Agdamag, and Kalin billed GEICO for the follow-up examination using CPT code 99213 and thereby falsely represented that JS presented with problems of low to moderate severity. What is more, following an additional purported follow-up examination of JS by Kalin on January 29, 2018, Nova Diagnostics, Guerra, Agdamag, and Kalin billed GEICO for an additional follow-up examination using CPT code 99215 and thereby falsely represented that JS presented with problems of moderate to high severity. In keeping with the fact that JS had no presenting problems of moderate to high severity, Nova Diagnostics, Guerra, Agdamag, and Kalin actually stopped treating JS after January 29, 2018.

(v)    On October 21, 2017, an Insured named JJ was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to JJ's vehicle, that there was minor damage to the other vehicle, that the airbags in JJ's vehicle did not deploy, and that JJ's vehicle was drivable following the accident. The police report further indicated that JJ was not injured in the accident. In keeping with the fact that JJ was not seriously injured in the accident, JJ did not visit any hospital emergency room following the accident. To the extent that JJ experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had resolved or were minimal within a few weeks of the accident. Even so, following a purported follow-up examination of JJ on January 2, 2018, Florida Wellness, Gomez, and Kalin, billed GEICO for the follow-up examinations using CPT code 99215 and thereby falsely represented that JJ presented with problems of moderate to high severity. What is more, following an additional purported follow-up examination of JJ by Kalin on March 2,

2018 – more than four months after the accident – Florida Wellness, Gomez, and Kalin billed GEICO for the follow-up examination using CPT code 99215, and thereby falsely represented that JJ presented with problems of moderate to high severity. In keeping with the fact that JJ had no presenting problems of moderate to high severity, Florida Wellness, Gomez, and Kalin actually stopped treating JJ after March 2, 2018.

(vi)   On January 28, 2018, an Insured named PW was involved in an automobile accident. The contemporaneous police report indicated that PW was not injured in the accident. In keeping with the fact that PW was not seriously injured in the accident, PW did not visit any hospital emergency room following the accident. To the extent that PW experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had resolved or were minimal within a few weeks of the accident. Even so, following a purported follow-up examination of PW on May 3, 2018, 2018, Ybor Medical, Duncan, and Kalin billed GEICO for the follow-up examinations using CPT code 99215 and thereby falsely represented that PW presented with problems of moderate to high severity.

(vii)  On May 8, 2018, an Insured named JM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, that there was minor damage to JM's vehicle, that the airbags in JM's vehicle did not deploy, and that JM's vehicle was drivable following the accident.  The police report further indicated that JM was not injured in the accident. In keeping with the fact that JM was not seriously injured in the accident, JM did not visit any hospital emergency room following the accident. To the extent that JM experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had resolved or were minimal within a few weeks of the accident. Even so, following purported follow-up examinations of JM on by Mathieson on June 27, 2018, August 1, 2018, and September 5, 2018, Himes Clinic, Kalin, and Mathieson billed GEICO for the follow-up examinations using CPT code 99213 and thereby falsely represented that JM presented with problems of low to moderate severity.

(viii) On October 16, 2018, an Insured named MF was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, and that the airbags in MF's vehicle did not deploy.  The police report further indicated that MF was not

injured in the accident. In keeping with the fact that MF was not seriously injured in the accident, MF did not visit any hospital emergency room following the accident. To the extent that MF experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had resolved or were minimal within a few weeks of the accident. Even so, following a purported follow-up examination of MF on February 21, 2019, Ybor Medical, Duncan, and Kalin billed GEICO for the follow-up examinations using CPT code 99215 and thereby falsely represented that MF presented with problems of moderate to high severity.

(ix)   On June 7, 2019, an Insured named JP was involved in an automobile accident. The contemporaneous police report indicated that the airbags in JP's vehicle did not deploy, and that JP's vehicle was drivable following the accident.  The police report further indicated that JP was not injured in the accident. In keeping with the fact that JP was not seriously injured in the accident, JP did not visit any hospital emergency room following the accident. To the extent that JP experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had resolved or were minimal within a few weeks of the accident. Even so, following a purported follow-up examination of JP on July 11, 2019, Florida Wellness, Gomez, and Kalin, billed GEICO for the follow-up examinations using CPT code 99215 and thereby falsely represented that JP presented with problems of moderate to high severity.  What is more, following an additional purported follow-up examination of JP by Kalin on September 20, 2019 – more than three months after the accident –  Florida Wellness, Gomez, and Kalin billed GEICO for the follow-up examination using CPT code 99215, and thereby falsely represented that JP presented with problems of moderate to high severity. In keeping with the fact that JP had no presenting problems of moderate to high severity, Florida Wellness, Gomez, and Kalin actually stopped treating JP after September 20, 2019.

(x)   On July 15, 2019, an Insured named AS was involved in an automobile accident. The contemporaneous police report indicated that the airbags in AS's vehicle did not deploy, and that AS's vehicle was drivable following the accident.  The police report further indicated that AS was not injured in the accident. In keeping with the fact that AS was not seriously injured in the accident, AS did not visit any hospital emergency room following the accident. To the extent that AS experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had resolved or were minimal within

a few weeks of the accident. Even so, following a purported follow-up examination of AS on October 1, 2019, Florida Wellness, Gomez, and Kalin, billed GEICO for the follow-up examinations using CPT code 99215 and thereby falsely represented that AS presented with problems of moderate to high severity.  What is more, following an additional purported follow-up examination of AS by Kalin on October 29, 2019 – more than three months after the accident –  Florida Wellness, Gomez, and Kalin billed GEICO for the follow-up examination using CPT code 99215, and thereby falsely represented that AS presented with problems of moderate to high severity. In keeping with the fact that AS had no presenting problems of moderate to high severity, Florida Wellness, Gomez, and Kalin actually stopped treating AS after October 29, 2019.

87.     These are only representative examples. In virtually  all of the claims for follow-up examinations identified in Exhibits "1" – "5", the Clinic Defendants, Clinic Owner Defendants, and Medical Director Defendants falsely represented that the Insureds presented with problems of low to moderate severity or moderate to high severity, when in fact the Insureds either did  not  have  any  genuine  presenting problems at all as the result of their minor automobile accidents at the time of the follow-up examinations, or else their presenting problems were minimal.

88.     In the claims for follow-up examinations identified in Exhibits "1" – "5", the Clinic Defendants, Clinic Owner Defendants, and Medical Director Defendants virtually always falsely represented that the Insureds presented with problems of low to moderate severity or moderate to high severity in order to create a false basis for their charges for the examinations under CPT codes 99213 and 99215 because follow-up examinations billable under CPT codes 99213 and 99215 are reimbursable

at higher rates than examinations involving presenting problems of minimal severity, or no severity.

89.     In the claims for follow-up examinations identified in Exhibits "1" – "5", the Clinic Defendants, Clinic Owner Defendants, and Medical Director Defendants routinely falsely represented that the Insureds presented with problems of either low to moderate severity or moderate to high severity in order to: (i) create a false basis for their charges for the examinations under CPT codes 99213 or 99215, because examinations billable under CPT codes 99213 and 99215 are reimbursable at higher rates than examinations involving presenting problems of minimal severity, or no severity; and (ii) create a false basis for the laundry list of other Fraudulent Services that the Defendants purported to provide to the Insureds.

**(ii)   Misrepresentations Regarding the Nature, Extent, and Results of the Follow-Up Examinations**

90.     What is more, in the claims for follow-up examinations identified in Exhibits "1" - "5", neither Kalin, Matheison, nor any other physician or chiropractor associated with the Clinic Defendants ever took any legitimate patient histories, conducted any legitimate physical examinations, or engaged in any legitimate medical decision-making at all.

91.     Rather, following the purported follow-up examinations, Kalin and Mathieson – at the direction of the respective Clinic Defendants and Clinic Owner Defendants – simply: (i) reiterated the false, boilerplate "diagnoses" from the Insureds' initial examinations; and either (ii) referred the Insureds for even more medically

unnecessary physical therapy services, despite the fact that the Insureds purportedly already had received extensive physical therapy services that supposedly had not been successful in resolving their purported pain symptoms; or (iii) discharged the Insureds from "treatment", to the extent that their PIP Benefits had been exhausted.

92.     The phony "follow-up examinations" that the Clinic Defendants, Clinic Owner Defendants, and Medical Director Defendants purported to provide to the Insureds in the claims identified in Exhibits "1" - "5" therefore were medically useless, and played no legitimate role in the treatment or care of the Insureds, because the putative "results" of the examinations were prearranged to comport with the medically unnecessary treatment plan that was pre-determined for each Insured from the moment they walked into the Clinic Defendants' offices.

93.     Additionally, Florida Wellness, Gomez, Nova Diagnostics, Guerra, Agdamag, and Kalin routinely billed GEICO for multiple putative follow-up examinations under CPT code 99211 contemporaneous with their supposed provision of physical therapy treatment.

94.     However, these supposed "examinations" were never truly separate services from the putative physical therapy services.

95.     Instead, Florida Wellness, Gomez, Kalin, Nova Diagnostics, Guerra, and Agdamag billed GEICO for the illusory follow-up examinations under CPT codes 99211 in order to maximize the fraudulent billing they submitted to GEICO.

96.     In keeping with the fact that the follow-up examinations purportedly provided contemporaneous with the physical therapy services were illusory, Florida Wellness, Gomez, Kalin, Nova Diagnostics, Guerra, and Agdamag never submitted any reports, notes, or any substantiating documentation whatsoever in connection with the phony follow-up examinations billed under CPT code 99211.

97.     Even so, Florida Wellness, Gomez, Kalin, Nova Diagnostics, Guerra, and Agdamag routinely submitted duplicative charges under CPT code 99211 for illusory follow-up examinations contemporaneous with charges for putative physical therapy services.

98.     For example:

(i)     Nova Diagnostics, Guerra, Agdamag, and Kalin billed GEICO for purported follow-up examinations under CPT code 99211 that were supposedly provided to an Insured named DB contemporaneous with physical therapy services purportedly provided on twenty separate dates including March 26, 2018, March 27, 2018, March 29, 2018, April 2, 2018, April 3, 2018, April 4, 2018, April 5, 2018, April 6, 2018, April 11, 2018, April 17, 2018, April 18, 2018, April 19, 2018, April 23, 2018, April 24, 2018, May 1, 2018, May 7, 2018, May 10, 2018, May 17, 2018, May 21, 2018, and May 22, 2018. This, despite the fact that: (a) no legitimate, separate follow-up examinations were provided; and (b) to the extent that Nova Diagnostics, Guerra, Agdamag, and Kalin provided any follow-up examinations at all, they were part and parcel of the physical therapy services billed under various CPT codes.

(ii)    Florida Wellness, Gomez, and Kalin billed GEICO for purported follow-up examinations under CPT code 99211 that were supposedly provided to an Insured named GE contemporaneous with physical therapy services purportedly provided on twenty-five separate dates including February 11, 2020, February 13, 2020, March 3, 2020, March 5, 2020, March 9, 2020, March 12, 2020, March 13, 2020, March 16, 2020, March 18, 2020, March 19, 2020, March 23, 2020, March 24, 2020, March 26, 2020, March 30, 2020, March 31, 2020, April 1, 2020, April 6, 2020, April

7, 2020, April 8, 2020, April 13, 2020, April 14, 2020, April 15, 2020, April 20, 2020, April 21, 2020, April 22, 2020. This, despite the fact that: (a) no legitimate, separate follow-up examinations were provided; and (b) to the extent that Florida Wellness, Gomez, and Kalin provided any follow-up examinations at all, they were part and parcel of the physical therapy services billed under various CPT codes.

(iii)   Florida Wellness, Gomez, and Kalin billed GEICO for purported follow-up examinations under CPT code 99211 that were supposedly provided to an Insured named FA contemporaneous with physical therapy services purportedly provided on <u>twenty separate dates</u> including March 16, 2020, March 17, 2020, March 19, 2020, March 20, 2020, March 23, 2020, March 24, 2020, March 25, 2020, March 26, 2020, March 30, 2020, March 31, 2020, April 1, 2020, April 6, 2020, April 7, 2020, April 8, 2020, April 13, 2020, April 14, 2020, April 15, 2020, April 20, April 21, 2020, April 22, 2020. This, despite the fact that: (a) no legitimate, separate follow-up examinations were provided; and (b) to the extent that Florida Wellness, Gomez, and Kalin provided any follow-up examinations at all, they were part and parcel of the physical therapy services billed under various CPT codes.

99.   These are only representative examples. In the claims for follow-up examinations identified in Exhibits "1" - "5", the Clinic Defendants, Clinic Owner Defendants, and Medical Director Defendants routinely fraudulently misrepresented that the examinations were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

(i)   the putative examinations were illusory, with outcomes that were pre-determined to result in substantially-identical, phony "diagnoses" and treatment recommendations, regardless of the Insureds' true individual circumstances and presentation;

(ii)   the charges for the putative examinations misrepresented the nature and extent of the examinations; and

(iii)   the Clinic Defendants never was eligible to collect PIP Benefits in connection with the examinations in the first instance, inasmuch as they were operated in violation of the Clinic Act.

60

**3.    The Fraudulent Claims for "Physical Therapy"**

100.    In keeping with the fact that the purported "results" of the follow-up examinations were pre-determined, and had no legitimate connection to the Insureds' true medical circumstances or presentation:

(i)      The Himes Clinic Defendants caused the majority of Insureds in the claims identified in Exhibit "1" to receive substantially identical "physical therapy" treatments for a substantially similar amount of time, regardless of the purported "outcome" of the examinations and previous physical therapy treatments, including: (a) hot/cold packs; (b) mechanical traction; (c) paraffin baths; (d) electrical stimulation therapy; (e) ultrasound therapy; (f) therapeutic exercises; (g) neuromuscular reeducation; (h) therapeutic activity; and (i) infrared therapy.

(ii)     The Florida Wellness Defendants caused the majority of Insureds in the claims identified in Exhibit "2" to receive substantially identical "physical therapy" treatments for a substantially similar amount of time, regardless of the purported "outcome" of the examinations and previous physical therapy treatments, including: (a) hot/cold packs; (b) mechanical traction; (c) paraffin baths; (d) electrical stimulation therapy; (e) ultrasound therapy; (f) therapeutic exercises; (g) neuromuscular reeducation; (h) therapeutic activity; and (i) infrared therapy.

(iii)    The Personal Rehabilitation Defendants caused the majority of Insureds in the claims identified in Exhibit "3" to receive substantially identical "physical therapy" treatments for a substantially similar amount of time, regardless of the purported "outcome" of the examinations and previous physical therapy treatments, including: (a) hot/cold packs; (b) mechanical traction; (c) paraffin baths; (d) electrical stimulation therapy; (e) ultrasound therapy; (f) therapeutic exercises; (g) neuromuscular reeducation; and (h) therapeutic activity; and (i) infrared therapy.

(iv)     The Ybor Medical Defendants caused the majority of Insureds in the claims identified in Exhibit "4" to receive substantially identical "physical therapy" treatments for a substantially similar amount of time,

regardless of the purported "outcome" of the examinations and previous physical therapy treatments, including: (a) hot/cold packs; (b) mechanical traction; (c) electrical stimulation therapy; (d) ultrasound therapy; and (e) therapeutic exercises.

(v)   The Nova Diagnostics Defendants caused the majority of Insureds in the claims identified in Exhibit "5" to receive substantially identical "physical therapy" treatments for a substantially similar amount of time, regardless of the purported "outcome" of the examinations and previous physical therapy treatments, including: (a) hot/cold packs; (b) mechanical traction; (c) paraffin baths; (d) ultrasound therapy; (e) therapeutic exercises; (f) neuromuscular reeducation; and (h) therapeutic activity; and (i) infrared therapy.

101.   In a legitimate clinical setting, each individual patient's physical therapy schedule, and the specific physical therapy modalities that will be used, must be tailored to the specific patient's circumstances, symptomatology, and presentation.

102.   In a legitimate clinical setting, the nature of, extent of, and schedule for physical therapy is constantly adjusted for each individual patient based on each patient's individual treatment progress, as assessed during each patient's follow-up examinations and on an ongoing basis as they receive the physical therapy.

103.   By contrast, at each of the Clinic Defendants, the nature and extent of the physical therapy that each Insured purportedly received was pre-determined, and had no legitimate connection to the Insureds' individual circumstances, presentation, or progress through the Defendants' fraudulent treatment and billing protocols. The purported "physical therapy" provided through each of the Clinic Defendants to GEICO Insureds therefore was medically useless.

104.   Furthermore, in the claims for physical therapy services identified in Exhibits "1" – "5"  the charges were fraudulent, unlawful, and non-reimbursable because the billing falsely represented that Kalin had performed or directly supervised the services, when in fact the "physical therapy" services were performed – to the extent that they were performed at all – by completely unsupervised massage therapists and/or chiropractic assistants associated with each of the Clinic Defendants, including: assistants including: (i) Cabezas, Cabrera, Sosa, and, Perez at Himes Clinic; (ii) Vazquez at Florida Wellness; (iii) Ugarte at Personal Rehabilitation (iv) Padron at Ybor Medical; and (v) De La Cruz and Ramos at Nova Diagnostics.

### 4.   The Fraudulently Unbundled Charges for Range of Motion and Muscle Strength Testing

105.   Subject to certain limited exceptions that are not applicable in this case, health care providers cannot conduct and bill for an initial examination then bill separately for contemporaneously-provided range of motion and muscle strength tests as these range of motion and muscle strength tests are part and parcel of the underlying initial examination.

106.   Nonetheless, in an attempt to maximize the fraudulent billing for examinations that they could submit for each Insured, Florida Wellness, Gomez, Personal Rehabilitation, Santos, Nova Diagnostics, Guerra, Brister, Agdamag, and Kalin fraudulently unbundled separate charges for purported range of motion testing and muscle strength testing from their charges for the putative initial examinations by billing GEICO for an initial examination under CPT code 99204, and then submitting

additional charges under CPT code 95851 for contemporaneous purported range of motion testing and CPT code 95832 for contemporaneous purported muscle strength testing.

107.   For example:

(i)   On November 9, 2015, Personal Rehabilitation, Santos, and Kalin purported to provide an initial examination to an Insured named JC. Thereafter, in addition to their charge for the examination under CPT code 99204, Personal Rehabilitation, Santos, and Kalin billed GEICO separate charges of $37.40 under CPT code 95851 for range of motion testing, and $53.84 under CPT code 95832 for muscle strength testing, in order to artificially separate what was inherently one total procedure into subparts that were integral to the whole for the purpose of increasing medical fees.

(ii)   On August 18, 2016, Florida Wellness, Gomez, and Kalin purported to provide an initial examination to an Insured named JP. Thereafter, in addition to their charge for the examination under CPT code 99204, Florida Wellness, Gomez, and Kalin billed GEICO separate charges of $37.40 under CPT code 95851 for range of motion testing, and $53.84 under CPT code 95832 for muscle strength testing, in order to artificially separate what was inherently one total procedure into subparts that were integral to the whole for the purpose of increasing medical fees.

(iii)   On January 25, 2017, Personal Rehabilitation, Santos, and Kalin purported to provide an initial examination to an Insured named LC. Thereafter, in addition to their charge for the examination under CPT code 99204, Personal Rehabilitation, Santos, and Kalin billed GEICO separate charges of $37.40 under CPT code 95851 for range of motion testing, and $53.84 under CPT code 95832 for muscle strength testing, in order to artificially separate what was inherently one total procedure into subparts that were integral to the whole for the purpose of increasing medical fees.

(iv)   On July 11, 2017, Florida Wellness, Gomez, and Kalin purported to provide an initial examination to an Insured named JF. Thereafter, in addition to their charge for the examination under CPT code 99204, Florida Wellness, Gomez, and Kalin billed GEICO separate charges of $37.40 under CPT code 95851 for range of motion testing, and $53.84

under CPT code 95832 for muscle strength testing, in order to artificially separate what was inherently one total procedure into subparts that were integral to the whole for the purpose of increasing medical fees.

(v)     On July 24, 2017, Nova Diagnostics, Guerra, Brister, and Kalin purported to provide an initial examination to an Insured named CL. Thereafter, in addition to their charge for the examination under CPT code 99204, Nova Diagnostics, Guerra, Brister, and Kalin billed GEICO separate charges of $37.40 under CPT code 95851 for range of motion testing, and $53.84 under CPT code 95832 for muscle strength testing, in order to artificially separate what was inherently one total procedure into subparts that were integral to the whole for the purpose of increasing medical fees.

(vi)    On September 22, 2017, Nova Diagnostics, Guerra, Brister, and Kalin purported to provide an initial examination to an Insured named LC. Thereafter, in addition to their charge for the examination under CPT code 99204, Nova Diagnostics, Guerra, Brister, and Kalin billed GEICO separate charges of $37.40 under CPT code 95851 for range of motion testing, and $53.84 under CPT code 95832 for muscle strength testing, in order to artificially separate what was inherently one total procedure into subparts that were integral to the whole for the purpose of increasing medical fees.

(vii)   On January 12, 2018, Nova Diagnostics, Guerra, Agdamag, and Kalin purported to provide an initial examination to an Insured named JR. Thereafter, in addition to their charge for the examination under CPT code 99204, Nova Diagnostics, Guerra, Agdamag, and Kalin billed GEICO separate charges of $37.40 under CPT code 95851 for range of motion testing, and $53.84 under CPT code 95832 for muscle strength testing, in order to artificially separate what was inherently one total procedure into subparts that were integral to the whole for the purpose of increasing medical fees.

(viii)  On March 19, 2018, Florida Wellness, Gomez, and Kalin purported to provide an initial examination to an Insured named YP. Thereafter, in addition to their charge for the examination under CPT code 99204, Florida Wellness, Gomez, and Kalin billed GEICO separate charges of $37.40 under CPT code 95851 for range of motion testing, and $53.84 under CPT code 95832 for muscle strength testing, in order to artificially separate what was inherently one total procedure into subparts that were integral to the whole for the purpose of increasing medical fees.

(ix)    On March 27, 2018, Nova Diagnostics, Guerra, Agdamag, and Kalin purported to provide an initial examination to an Insured named RF. Thereafter, in addition to their charge for the examination under CPT code 99204, Nova Diagnostics, Guerra, Agdamag, and Kalin billed GEICO separate charges of $37.40 under CPT code 95851 for range of motion testing, and $53.84 under CPT code 95832 for muscle strength testing, in order to artificially separate what was inherently one total procedure into subparts that were integral to the whole for the purpose of increasing medical fees.

(x)    On September 9, 2019, Personal Rehabilitation, Santos, and Kalin purported to provide an initial examination to an Insured named MF. Thereafter, in addition to their charge for the examination under CPT code 99204, Personal Rehabilitation, Santos, and Kalin billed GEICO separate charges of $37.40 under CPT code 95851 for range of motion testing, and $53.84 under CPT code 95832 for muscle strength testing, in order to artificially separate what was inherently one total procedure into subparts that were integral to the whole for the purpose of increasing medical fees.

108.    These are only representative examples. In the claims for purported initial examinations that are identified in Exhibits "2", "3", and "5", Florida Wellness, Gomez, Personal Rehabilitation, Santos, Nova Diagnostics, Guerra, Brister, Agdamag, and Kalin routinely fraudulently and unlawfully unbundled separate charges for range of motion and muscle strength testing under CPT codes 95851 and 95832.

109.    Not only did Florida Wellness, Gomez, Personal Rehabilitation, Santos, Nova Diagnostics, Guerra, Brister, Agdamag, and Kalin unlawfully unbundle their charges for range of motion and muscle strength testing from the underlying examination charges, they further unbundled the charges for range of motion and muscle strength testing in order to inflate their billing even more.

110.   Pursuant to the CPT Assistant, when range of motion testing and muscle strength testing are performed on the same date, all of the testing should be reported and billed using CPT code 97750.

111.   CPT code 97750, described as "Physical performance test or measurement (e.g., musculoskeletal, functional capacity), with written report, each 15 minutes" (the "Physical Performance Test"), identifies a number of multi-varied tests and measurements of physical performance of a select area or number of areas. These tests include services such as extremity testing for strength, dexterity, or stamina, and muscle strength testing with torque curves during isometric and isokinetic exercise, whether by mechanized evaluation or computerized evaluation. They also include creation of a written report.

112.   Additionally, CPT code 97750 is a "time-based" code that that allows for a separate charge for every 15 minutes of testing that is performed.

113.   Thus, if a health care provider performed 15 minutes of range of motion and muscle testing, it would be permitted a single charge under CPT code 97750. If the provider performed 30 minutes of computerized range of motion and muscle testing, it would be permitted to submit two charges under CPT code 97750, and so forth.

114.   In the claims for range of motion and muscle strength testing that are identified in Exhibits "2", "3", and "5", Florida Wellness, Gomez, Personal Rehabilitation, Santos, Nova Diagnostics, Guerra, Brister, Agdamag, and Kalin

routinely purported to provide the range of motion and muscle strength testing to individual Insureds on the same dates of service.

115.   To the extent that Florida Wellness, Gomez, Personal Rehabilitation, Santos, Nova Diagnostics, Guerra, Brister, Agdamag, and Kalin actually provided the range of motion and muscle tests to Insureds in the first instance, the range of motion and muscle tests – together –  virtually never took more than 15 minutes to perform. Thus, even if the range of motion and muscle tests that Florida Wellness, Gomez, Personal Rehabilitation, Santos, Nova Diagnostics, Guerra, Brister, Agdamag, and Kalin purported to provide were medically necessary, and performed in the first instance, Florida Wellness, Gomez, Personal Rehabilitation, Santos, Nova Diagnostics, Guerra, Brister, Agdamag, and Kalin would be limited to a single, time-based charge under CPT code 97750 for each date of service on which they performed range of motion and muscle tests on an Insured.

116.   However, in order to maximize their fraudulent billing for the range of motion and muscle tests, Florida Wellness, Gomez, Personal Rehabilitation, Santos, Nova Diagnostics, Guerra, Brister, Agdamag, and Kalin routinely unbundled what should have been – at most – a single charge under CPT code 97750 for both computerized range of motion and muscle testing into: (i) a charge under CPT code 95832 (for the muscle tests); and a charge under CPT code 95851 (for the range of motion tests).

117.   By unbundling what should – at most – have been a single charge under CPT code 97750 into multiple charges under CPT codes 95851 and 95832, Florida Wellness, Gomez, Personal Rehabilitation, Santos, Nova Diagnostics, Guerra, Brister, Agdamag, and Kalin routinely further inflated the fraudulent computerized range of motion and muscle strength tests charges that they submitted to GEICO

**5.     The Fraudulent Charges for Physical Performance Tests**

118.   Not only did Florida Wellness, Gomez, Personal Rehabilitation, Santos, Nova Diagnostics, Guerra, Brister, Agdamag, and Kalin unlawfully unbundle their charges for range of motion and muscle strength testing from the underlying examination charges by submitting separate charges under CPT codes 95851 and 95832, they further sought to artificially inflate their billing by submitting an additional charge under CPT code 97750, for "Physical Performance Tests" purportedly provided by Kalin.

119.   The "Physical Performance Tests" were medically unnecessary, illusory, and not significantly different than the manual range of motion and muscle strength tests that were purportedly performed during each initial and follow-up examination that Florida Wellness, Gomez, Personal Rehabilitation, Santos, Nova Diagnostics, Guerra, Brister, Agdamag, and Kalin purported to provide to the Insureds.

120.   Under the circumstances employed by Florida Wellness, Gomez, Personal Rehabilitation, Santos, Nova Diagnostics, Guerra, Brister, Agdamag, and Kalin, the "Physical Performance Tests" represented purposeful and unnecessary

duplication of the range of motion and muscle strength testing purportedly conducted during each examination that Florida Wellness, Gomez, Personal Rehabilitation, Santos, Nova Diagnostics, Guerra, Brister, Agdamag, and Kalin purported to provide to the Insureds.

**6.      The Fraudulent Misrepresentations Regarding the Existence of Written, Interpretive Reports for the Range of Motion, Muscle Strength, and Physical Performance Tests**

121.    Not only were Florida Wellness, Gomez, Personal Rehabilitation, Santos, Nova Diagnostics, Guerra, Brister, Agdamag, and Kalin's charges for the range of motion, muscle strength, and physical performance tests fraudulent because the billing was fraudulently unbundled, but the charges also were fraudulent because they falsely represented that Florida Wellness, Gomez, Personal Rehabilitation, Santos, Nova Diagnostics, Guerra, Brister, Agdamag, and Kalin prepared written reports interpreting the test data.

122.    Pursuant to the CPT Assistant, when a health care provider submits a charge for range of motion testing using CPT code 95851, muscle strength testing under CPT code 95832, or physical performance tests under CPT code 97750, the provider represents that it has prepared a written report interpreting the data obtained from the tests.

123.    The CPT Assistant states that (i) "Interpretation of the results with preparation of a separate, distinctly, identifiable, signed written report is required when reporting codes 95851".

124.   The CPT Assistant also states that "[t]he language included in the code descriptor for use of these codes indicates, the preparation of a separate written report of the findings as a necessary component of the procedure" when using CPT code 95832 to charge for muscle testing.

125.   Likewise, the CPT Assistant also notes that for CPT code 97750, documentation should include "a description of the test and measure protocol, the data collected, and the impact of the outcome of the test and measure on the patient's plan for care (ie, need for continuing treatment, discharge from treatment, or referral to other provider[s])."

126.   Though Florida Wellness, Gomez, Personal Rehabilitation, Santos, Nova Diagnostics, Guerra, Brister, Agdamag, and Kalin routinely submitted billing for range of motion tests using CPT code 95851, muscle strength testing using CPT code 95832, and both of them together under CPT code 97750, Florida Wellness, Gomez, Personal Rehabilitation, Santos, Nova Diagnostics, Guerra, Brister, Agdamag, and Kalin did not prepare written reports interpreting the data obtained from the tests.

127.   Florida Wellness, Gomez, Personal Rehabilitation, Santos, Nova Diagnostics, Guerra, Brister, Agdamag, and Kalin did not prepare written reports interpreting the data obtained from the tests because the tests were not meant to impact any Insured's course of treatment. Rather, to the extent they were performed at all, the tests were performed as part of the Florida Wellness, Personal Rehabilitation, and Nova Diagnostics Defendants' predetermined fraudulent billing

and treatment protocol, and were designed solely to financially enrich the Florida Wellness, Personal Rehabilitation, and Nova Diagnostics Defendants' at the expense of GEICO and other insurers.

**7.    The Fraudulent Charges for Durable Medical Equipment**

128.   As part of their fraudulent scheme, Ybor Medical, Duncan, and Kalin purported to provide many Insureds with durable medical equipment, namely a lower back brace known as a lumbosacral orthotic ("LSO"), and billed GEICO for the LSO under Health Care Common Procedure Coding System ("HCCPCS") code L0627.

129.   As set forth below, Ybor Medical, Duncan, and Kalin's charges for the LSOs identified in Exhibit "4" also were fraudulent in that they misrepresented the medical necessity of the putative LSOs.

130.   The LSO is a rigid, custom-fitted, lower-back brace designed to restrict the movement of the patient's torso and support the patient's lumbar spine. Because of its rigidity and required placement on a patient's lower back, an LSO must be custom-fitted in order for it to be properly utilized by the patient.

131.   In a legitimate clinical setting, an LSO is reserved for patients who exhibit spinal instability or for patients who have recently undergone spinal surgery, and its prescription is inconsistent with the goals of physical therapy treatment designed to restore and increase range of motion and functionality of the lumbar spine.

132.    Indeed, the medically unnecessary prescription of an LSO – and resulting immobilization of the lumbar spine – may put the patient at considerable risk of weakening muscles or even muscle atrophy in the lower back.

133.    Moreover, in a legitimate clinical setting, an LSO should not be provided to a patient before that patient has attempted and failed a legitimate course of conservative treatment.

134.    Virtually none of the Insureds in the claims identified in Exhibit "4" suffered from spinal instability. In fact, virtually none of the Insureds in the claims identified in Exhibit "4" suffered any serious injuries at all, much less health problems requiring spinal surgery and subsequent immobilization of their spine.

135.    Virtually none of the Insureds in the claims identified in Exhibit "4" had attempted and failed a legitimate course of conservative treatment prior to their receipt of a prescription for an LSO.

136.    Even so, following their fraudulent examinations, boilerplate examination reports, duplicative and medically-impossible diagnoses, and purported physical therapy treatment, Ybor Medical, Duncan, and Kalin purported to provide many Insureds with an LSO, despite that fact that:

(i)      Virtually none of the Insureds suffered from spinal instability or were recovering from spinal surgery;

(ii)     in many cases, the Insureds did not suffer from any injuries at all;

(iii)    neither Kalin, nor any other individual associated with Ybor Medical, ever measured or fitted the device for the Insureds;

73

(iv)    the Insureds had not yet failed any legitimate course of conservative treatment and, in fact, were routinely provided the LSO within days of their minor accident at Ybor Medical; and

(v)    the Insureds were concomitantly referred for physical therapy treatment at Ybor Medical, the putative purpose of which was to restore the range of motion and functionality of, among other things, the Insureds' lumbar spines.

137.    For example:

(i)    On March 29, 2015, an Insured named VB was involved in an automobile accident. One week later, on April 6, 2015, VB presented to Ybor Medical for an initial examination by Kalin At the conclusion of the purported initial examination, Ybor Medical, Duncan, and Kalin prescribed VB with a medically unnecessary LSO, despite the fact that VB: (a) was never fitted for the device; (b) did not suffer from spinal instability and was not recovering from spinal surgery; and (c) had not yet failed a legitimate course of conservative treatment, and, in fact, was concomitantly referred by Kalin for physical therapy treatment at Ybor Medical, the putative purpose of which was to increase, rather than decrease, VB's range of motion. Ybor Medical, Duncan, and Kalin then submitted a bill to GEICO under HCPCS code L0627, seeking reimbursement of $786.06 for the medically unnecessary LSO.

(ii)    On August 22, 2016, an Insured named RC was involved in an automobile accident. Just eight days later, on August 30, 2016, RC presented to Ybor Medical for an initial examination by Kalin At the conclusion of the purported initial examination, Ybor Medical, Duncan, and Kalin prescribed RC with a medically unnecessary LSO, despite the fact that RC: (a) was never fitted for the device; (b) did not suffer from spinal instability and was not recovering from spinal surgery; and (c) had not yet failed a legitimate course of conservative treatment, and, in fact, was concomitantly referred by Kalin for physical therapy treatment at Ybor Medical, the putative purpose of which was to increase, rather than decrease, RC's range of motion. Ybor Medical, Duncan, and Kalin then submitted a bill to GEICO under HCPCS code L0627, seeking reimbursement of $786.06 for the medically unnecessary LSO.

(iii)    On September 21, 2016, an Insured named JR was involved in an automobile accident. Just five day later, on September 21, 2016, JR presented to Ybor Medical for an initial examination by Kalin. At the

74

conclusion of the purported initial examination, Ybor Medical, Duncan, and Kalin provided JR with a medically unnecessary LSO, despite the fact that JR: (a) was never fitted for the device; (b) did not suffer from spinal instability and was not recovering from spinal surgery; and (c) had not yet failed a legitimate course of conservative treatment, and, in fact, was concomitantly referred by Kalin for physical therapy treatment at Ybor Medical, the putative purpose of which was to increase, rather than decrease, JR's range of motion. Ybor Medical, Duncan, and Kalin then submitted a bill to GEICO under HCPCS code L0627, seeking reimbursement of $786.06 for the medically unnecessary LSO.

(iv)   On March 18, 2017, an Insured named RC was involved in an automobile accident. Just ten days later, on March 28, 2017, RC presented to Ybor Medical for an initial examination by Kalin At the conclusion of the purported initial examination, Ybor Medical, Duncan, and Kalin prescribed RC with a medically unnecessary LSO, despite the fact that RC: (a) was never fitted for the device; (b) did not suffer from spinal instability and was not recovering from spinal surgery; and (c) had not yet failed a legitimate course of conservative treatment, and, in fact, was concomitantly referred by Kalin for physical therapy treatment at Ybor Medical, the putative purpose of which was to increase, rather than decrease, RC's range of motion. Ybor Medical, Duncan, and Kalin then submitted a bill to GEICO under HCPCS code L0627, seeking reimbursement of $786.06 for the medically unnecessary LSO.

(v)   On January 16, 2018, an Insured named MR was involved in an automobile accident. Just nine days later, on January 25, 2018, MR presented to Ybor Medical for an initial examination by Kalin At the conclusion of the purported initial examination, Ybor Medical, Duncan, and Kalin provided MR with a medically unnecessary LSO, despite the fact that MR: (a) was never fitted for the device; (b) did not suffer from spinal instability and was not recovering from spinal surgery; and (c) had not yet failed a legitimate course of conservative treatment, and, in fact, was concomitantly referred by Kalin for physical therapy treatment at Ybor Medical, the putative purpose of which was to increase, rather than decrease, MR's range of motion. Ybor Medical, Duncan, and Kalin then submitted a bill to GEICO under HCPCS code L0627, seeking reimbursement of $786.06 for the medically unnecessary LSO.

138.   These are only representative examples. In virtually all of the claims for LSOs identified in Exhibit "4", Ybor Medical, Duncan, and Kalin falsely represented that the provided LSOs were medically necessary, when in fact they were not.

## III.   The Fraudulent Claims the Defendants Submitted or Caused to be Submitted to GEICO

139.   To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted thousands of HCFA-1500 forms and treatment reports through the Clinic Defendants to GEICO, containing thousands of individual charges, seeking payment for the Fraudulent Services for which the Defendants were not entitled to receive payment.

140.   The claims that the Defendants submitted or caused to be submitted to GEICO were false and misleading in the following, material respects:

(i)   The HCFA-1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Clinic Defendants were in compliance with the Clinic Act and eligible to collect PIP Benefits in the first instance. In fact, the Clinic Defendants never were in compliance with the Clinic Act, and never were eligible to collect PIP Benefits because: (i) Kalin never legitimately supervised Himes Clinic; and (ii) Florida Wellness, Personal Rehabilitation, Ybor Medical, and Nova Diagnostics operated without legitimate medical directors who legitimately fulfilled the statutory requirements applicable to clinic medical directors.

(ii)   The HCFA-1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement. In fact, the Fraudulent Services were not lawfully provided, and were not eligible for PIP reimbursement, because: (a) they were medically unnecessary and provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat

or otherwise benefit the Insureds who purportedly were subjected to them; and (b) in the case of the physical therapy services, because they were provided by unsupervised massage therapists and/or chiropractic assistants and other unlicensed individuals in contravention of Florida law.

(iii)   The HCFA-1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary and, in many cases, misrepresented to GEICO that the Fraudulent Services actually were performed. In fact, the Fraudulent Services frequently were not performed at all and, to the extent that they were performed, they were not medically necessary and were performed as part of a pre-determined fraudulent treatment and billing protocol designed solely to financially enrich the Defendants, not to benefit the Insureds who supposedly were subjected to them.

(iv)   The HCFA-1500 forms and treatment reports submitted by and on behalf of the Defendants frequently misrepresented and exaggerated the level of the Fraudulent Services and the nature of the Fraudulent Services that purportedly were provided, in order to increase the amount of reimbursement the Defendants could unlawfully obtain.

## IV.   The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

141.   The Defendants were legally and ethically obligated to act honestly and with integrity in connection with their performance of the Fraudulent Services and their submission of charges to GEICO. Even so, the Defendants knowingly misrepresented and concealed facts related to the Clinic Defendants in an effort to prevent discovery: (i) that Himes Clinic lacked a licensed health care practitioner-owner who legitimately supervised the business activities of Himes Clinic (ii) that Florida Wellness, Personal Rehabilitation, Ybor Medical, and Nova Diagnostics lacked legitimate medical directors, and therefore were ineligible to collect PIP Benefits in the first instance; (iii) that the Fraudulent Services were provided – to the extent that they

were provided at all – by unsupervised massage therapists and/or chiropractic assistants, and therefore were not eligible for PIP reimbursement; and (iv) that the Fraudulent Services were medically unnecessary.

142.   GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially-valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and acts of concealment described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO has incurred damages of more than $4,900,000.00.

143.   GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it commenced this action.

### FIRST CAUSE OF ACTION
### Against Himes Clinic
### (Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)

144.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-143 above.

145.   There is an actual case in controversy between GEICO and Himes Clinic regarding more than $75,000.00 in pending fraudulent claims for the Fraudulent Services that have been submitted to GEICO.

146.   Himes Clinic has no right to receive payment for any pending bills submitted to GEICO because it was unlawfully operated in violation of the Clinic Act.

147.   Himes Clinic has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not lawfully provided or billed to GEICO.

148.   Himes Clinic has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not performed by individuals who actually were licensed to perform the pertinent services, or else constituted non-reimbursable massage.

149.   Himes Clinic has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

150.   Himes Clinic has no right to receive payment for any pending bills submitted to GEICO because, in many cases, the Fraudulent Services never were provided in the first instance.

151.   Himes Clinic has no right to receive payment for any pending bills submitted to GEICO because the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

152.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Himes Clinic has no right to receive payment for any pending bills submitted to GEICO.

## SECOND CAUSE OF ACTION
### Against Kalin
### (Violation of RICO, 18 U.S.C. § 1962(c))

153.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-143 above.

154.    Himes Clinic is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

155.    Kalin knowingly has conducted and/or participated, directly or indirectly, in the conduct of Himes Clinic's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over six years seeking payments that Himes Clinic was not eligible to receive under the No-Fault Law because: (i) Himes Clinic unlawfully was operated in violation of the Clinic Act; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Himes Clinic Defendants rather than to treat or otherwise benefit the Insureds who purportedly were

subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

156.   A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

157.   Himes Clinic's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Kalin operated Himes Clinic, inasmuch as Himes Clinic was not engaged in a legitimate healthcare practice, and acts of mail fraud therefore were essential in order for Himes Clinic to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Himes Clinic Defendants continue to attempt collection on the fraudulent billing submitted through Himes Clinic to the present day.

158.   Himes Clinic is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Himes Clinic in

pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

159.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $700,000.00 pursuant to the fraudulent bills submitted through the Himes Clinic enterprise.

160.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## THIRD CAUSE OF ACTION
### Against Kalin, Cabrera, Cabezas, Sosa, and Perez
### (Violation of RICO, 18 U.S.C. § 1962(d))

161.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-143 above.

162.   Himes Clinic is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

163.   Kalin, Cabrera, Cabezas, Sosa, and Perez are or were employed by or associated with the Himes Clinic enterprise.

164.   Kalin, Cabrera, Cabezas, Sosa, and Perez  knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Himes Clinic's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of

fraudulent charges on a continuous basis for over six years seeking payments that Himes Clinic was not eligible to receive under the No-Fault Law because: (i) Himes Clinic unlawfully was operated in violation of the Clinic Act; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Himes Clinic Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

165.   A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1". Each such mailing was made in furtherance of the mail fraud scheme.

166.   Kalin, Cabrera, Cabezas, Sosa, and Perez knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

167.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $700,000.00 pursuant to the fraudulent bills submitted through the Himes Clinic enterprise.

168.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**FOURTH CAUSE OF ACTION**
**Against Himes Clinic and Kalin**
**(Under Fla. Stat. 501.201 et. seq.)**

169.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-143 above.

170.   Himes Clinic and Kalin are actively engaged in trade and commerce in the State of Florida.

171.   GEICO and its Insureds are "consumers" as defined by Fla. Stat. 501.203.

172.   Himes Clinic and Kalin engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

173.   The bills and supporting documents submitted or caused to be submitted by Himes Clinic and Kalin to GEICO were fraudulent in that they misrepresented: (i) Himes Clinic's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO;

(iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services actually were performed in the first instance.

174.    Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous.  Additionally, the conduct of Himes Clinic and Kalin has been materially injurious to GEICO and its Insureds.

175.    The conduct of the Himes Clinic and Kalin was the actual and proximate cause of the damages sustained by GEICO.

176.    Himes Clinic and Kalin's unfair and deceptive acts have caused GEICO to sustain damages of at least $700,000.00.

177.    By reason of Himes Clinic and Kalin's conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2).

<u>FIFTH CAUSE OF ACTION</u>
Against the Himes Clinic Defendants
(Common Law Fraud)

178.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-143 above.

179.    The Himes Clinic Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of submitting, or causing to be submitted, thousands of fraudulent charges through Himes Clinic for the Fraudulent Services.

180.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that that Himes

Clinic was in compliance with the Clinic Act and eligible to collect PIP Benefits in the first instance, when in fact Himes Clinic never was in compliance with the Clinic Act, and never was eligible to collect PIP Benefits; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when in fact the Fraudulent Services were not lawfully provided, and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services actually were performed, when in many cases they were not actually performed.

181.   The Himes Clinic Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Himes Clinic that were not reimbursable.

182.   GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $700,000.00 pursuant to the fraudulent bills that were submitted or caused to be submitted by the Himes Clinic Defendants through Himes Clinic.

183.   The   Himes   Clinic   Defendants'   extensive   fraudulent   conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

184.   Accordingly,   by   virtue   of   the   foregoing,   GEICO   is   entitled   to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

<u>SIXTH CAUSE OF ACTION</u>
Against the Himes Clinic Defendants
(Unjust Enrichment)

185.   GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-143 above.

186.   As set forth above, the Himes Clinic Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

187.   When GEICO paid the bills and charges submitted or caused to be submitted by the Himes Clinic Defendants through Himes Clinic, it reasonably believed that it was legally obligated to make such payments based on the Himes Clinic Defendants' improper, unlawful, and/or unjust acts.

188.   The Himes Clinic Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that the Himes Clinic Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

189.   The Himes Clinic Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

190.   By reason of the above, the Himes Clinic Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $700,000.00.

**SEVENTH CAUSE OF ACTION**
**Against Florida Wellness**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

191.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-143 above.

192.   There is an actual case in controversy between GEICO and Florida Wellness regarding more than $75,000.00 in pending fraudulent claims for the Fraudulent Services that have been submitted to GEICO.

193.   Florida Wellness has no right to receive payment for any pending bills submitted to GEICO because it was unlawfully operated in violation of the Clinic Act.

194.   Florida Wellness has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not lawfully provided or billed to GEICO.

195.   Florida Wellness has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not performed by individuals who actually were licensed to perform the pertinent services, or else constituted non-reimbursable massage.

196. Florida Wellness has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

197. Florida Wellness has no right to receive payment for any pending bills submitted to GEICO because, in many cases, the Fraudulent Services never were provided in the first instance.

198. Florida Wellness has no right to receive payment for any pending bills submitted to GEICO because the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

199. Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Florida Wellness has no right to receive payment for any pending bills submitted to GEICO.

<u>EIGHTH CAUSE OF ACTION</u>
Against Gomez and Kalin
(Violation of RICO, 18 U.S.C. § 1962(c))

200. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-143 above.

89

201.   Florida Wellness is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

202.   Gomez and Kalin knowingly have conducted and/or participated, directly or indirectly, in the conduct of Florida Wellness's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over five years seeking payments that Florida Wellness was not eligible to receive under the No-Fault Law because: (i) Florida Wellness unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Florida Wellness Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

203.   A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering

activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2".

204.   Florida Wellness's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Gomez and Kalin operated Florida Wellness, inasmuch as Florida Wellness was not engaged in a legitimate healthcare practice, and acts of mail fraud therefore were essential in order for Florida Wellness to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Florida Wellness Defendants continue to attempt collection on the fraudulent billing submitted through Florida Wellness to the present day.

205.   Florida Wellness is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Florida Wellness in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

206.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $930,000.00 pursuant to the fraudulent bills submitted through the Florida Wellness enterprise.

207.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**NINTH CAUSE OF ACTION**
**Against Gomez, Kalin, and Vazquez**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

208.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-143 above.

209.   Florida Wellness is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

210.   Gomez, Kalin, and Vazquez  are employed by or associated with the Florida Wellness enterprise.

211.   Gomez, Kalin, and Vazquez  knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Florida Wellness's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over five years seeking payments that Florida Wellness was not eligible to receive under the No-Fault Law because: (i) Florida Wellness unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were

not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Florida Wellness Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

212.   A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2". Each such mailing was made in furtherance of the mail fraud scheme.

213.   Gomez, Kalin, and Vazquez  knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

214.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $930,000.00 pursuant to the fraudulent bills submitted through the Florida Wellness enterprise.

215.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

<u>TENTH CAUSE OF ACTION</u>
Against Florida Wellness, Gomez, and Kalin
(Under Fla. Stat. 501.201 <u>et</u>. <u>seq</u>.)

216.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-143 above.

217.   Florida Wellness, Gomez, and Kalin are actively engaged in trade and commerce in the State of Florida.

218.   GEICO and its Insureds are "consumers" as defined by Fla. Stat. 501.203.

219.   Florida Wellness, Gomez, and Kalin engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

220.   The bills and supporting documents submitted or caused to be submitted by Florida Wellness, Gomez, and Kalin to GEICO were fraudulent in that they misrepresented: (i) Florida Wellness's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services actually were performed in the first instance.

221.    Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous.  Additionally, the conduct of Florida Wellness, Gomez, and Kalin has been materially injurious to GEICO and its Insureds.

222.    The conduct of Florida Wellness, Gomez, and Kalin was the actual and proximate cause of the damages sustained by GEICO.

223.    Florida Wellness, Gomez, and Kalin's unfair and deceptive acts have caused GEICO to sustain damages of at least $930,000.00.

224.    By reason of the Florida Wellness, Gomez, and Kalin's conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2).

## ELEVENTH CAUSE OF ACTION
### Against the Florida Wellness Defendants
### (Common Law Fraud)

225.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-143 above.

226.    The Florida Wellness Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of submitting, or causing to be submitted, thousands of fraudulent charges through Florida Wellness for the Fraudulent Services.

227.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that that Florida Wellness was in compliance with the Clinic Act and eligible to collect PIP

Benefits in the first instance, when in fact Florida Wellness never was in compliance with the Clinic Act, and never was eligible to collect PIP Benefits, because it was operated without a legitimate medical director; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and billed to GEICO and eligible for PIP reimbursement, when in fact the Fraudulent Services were not lawfully provided or billed to GEICO, and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services actually were performed, when in many cases they were not actually performed.

228.   The Florida Wellness Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Florida Wellness that were not reimbursable.

229.   GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $930,000.00 pursuant to the fraudulent bills that were submitted or caused to be submitted by the Florida Wellness Defendants through Florida Wellness.

230.   The Florida Wellness Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

231.   Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**TWELFTH CAUSE OF ACTION**
**Against the Florida Wellness Defendants**
**(Unjust Enrichment)**

232.   GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-143 above.

233.   As set forth above, the Florida Wellness Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

234.   When GEICO paid the bills and charges submitted or caused to be submitted by the Florida Wellness Defendants through Florida Wellness, it reasonably believed that it was legally obligated to make such payments based on the Florida Wellness Defendants' improper, unlawful, and/or unjust acts.

235.   The Florida Wellness Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that the Florida Wellness Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

236.   The Florida Wellness Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

237.   By reason of the above, the Florida Wellness Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $930,000.00.

## THIRTEENTH CAUSE OF ACTION
### Against Personal Rehabilitation
### (Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)

238.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-143 above.

239.   There is an actual case in controversy between GEICO and Personal Rehabilitation regarding more than $75,000.00 in pending fraudulent claims for the Fraudulent Services that have been submitted to GEICO.

240.   Personal Rehabilitation has no right to receive payment for any pending bills submitted to GEICO because it was unlawfully operated in violation of the Clinic Act.

241.   Personal Rehabilitation has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not lawfully provided or billed to GEICO.

242.   Personal Rehabilitation has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not

performed by individuals who actually were licensed to perform the pertinent services, or else constituted non-reimbursable massage.

243.   Personal Rehabilitation has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

244.   Personal Rehabilitation has no right to receive payment for any pending bills submitted to GEICO because, in many cases, the Fraudulent Services never were provided in the first instance.

245.   Personal Rehabilitation has no right to receive payment for any pending bills submitted to GEICO because the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

246.   Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Personal Rehabilitation has no right to receive payment for any pending bills submitted to GEICO.

<u>FOURTEENTH CAUSE OF ACTION</u>
Against Santos and Kalin
(Violation of RICO, 18 U.S.C. § 1962(c))

247.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-143 above.

248.    Personal Rehabilitation is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

249.    Santos and Kalin knowingly have conducted and/or participated, directly or indirectly, in the conduct of Personal Rehabilitation's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over six years seeking payments that Personal Rehabilitation was not eligible to receive under the No-Fault Law because: (i) Personal Rehabilitation unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Personal Rehabilitation Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were

provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

250.   A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3".

251.   Personal Rehabilitation's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Santos and Kalin operated Personal Rehabilitation, inasmuch as Personal Rehabilitation was not engaged in a legitimate healthcare practice, and acts of mail fraud therefore were essential in order for Personal Rehabilitation to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Personal Rehabilitation Defendants continue to attempt collection on the fraudulent billing submitted through Personal Rehabilitation to the present day.

252.   Personal Rehabilitation is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by

Personal Rehabilitation in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

253.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $2,500,000.00 pursuant to the fraudulent bills submitted through the Personal Rehabilitation enterprise.

254.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## FIFTEENTH CAUSE OF ACTION
### Against Santos, Kalin, and Ugarte
### (Violation of RICO, 18 U.S.C. § 1962(d))

255.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-143 above.

256.   Personal Rehabilitation is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

257.   Santos, Kalin, and Ugarte are employed by or associated with the Personal Rehabilitation enterprise.

258.   Santos, Kalin, and Ugarte knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Personal Rehabilitation's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon

the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over six years seeking payments that Personal Rehabilitation was not eligible to receive under the No-Fault Law because: (i) Personal Rehabilitation unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Personal Rehabilitation Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

259.   A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3". Each such mailing was made in furtherance of the mail fraud scheme.

260.   Santos, Kalin, and Ugarte knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile

insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

261.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $2,500,000.00 pursuant to the fraudulent bills submitted through the Personal Rehabilitation enterprise.

262.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**SIXTEENTH CAUSE OF ACTION**
**Against Personal Rehabilitation, Santos, and Kalin**
**(Under Fla. Stat. 501.201 et. seq.)**

263.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-143 above.

264.   Personal Rehabilitation, Santos, and Kalin are actively engaged in trade and commerce in the State of Florida.

265.   GEICO and its Insureds are "consumers" as defined by Fla. Stat. 501.203.

266.   Personal Rehabilitation, Santos, and Kalin engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

267.   The bills and supporting documents submitted or caused to be submitted Personal Rehabilitation, Santos, and Kalin to GEICO were fraudulent in that they misrepresented: (i) Personal Rehabilitation's eligibility to collect PIP Benefits in

the first instance; (ii) that the Fraudulent Services were lawfully provided and billed

to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that

the Fraudulent Services actually were performed in the first instance.

268.    Such acts and practices offend public policy and are immoral, unethical,

oppressive, and unscrupulous.  Additionally, the conduct of Personal Rehabilitation,

Santos, and Kalin has been materially injurious to GEICO and its Insureds.

269.    The conduct of Personal Rehabilitation, Santos, and Kalin was the actual

and proximate cause of the damages sustained by GEICO.

270.    Personal Rehabilitation, Santos, and Kalin's unfair and deceptive acts

have caused GEICO to sustain damages of at least $2,500,000.00.

271.    By reason of Personal Rehabilitation, Santos, and Kalin's conduct, GEICO

is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat.

501.211(2).

**SEVENTEENTH CAUSE OF ACTION**
**Against the Personal Rehabilitation Defendants**
**(Common Law Fraud)**

272.    GEICO incorporates, as though fully set forth herein, each and every

allegation in paragraphs 1-143 above.

273.    The Personal Rehabilitation Defendants intentionally and knowingly

made false and fraudulent statements of material fact to GEICO and concealed

material facts from GEICO in the course of submitting, or causing to be submitted,

hundreds of fraudulent charges through Personal Rehabilitation for the Fraudulent Services.

274.   The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that that Personal Rehabilitation was in compliance with the Clinic Act and eligible to collect PIP Benefits in the first instance, when in fact Personal Rehabilitation never was in compliance with the Clinic Act, and never was eligible to collect PIP Benefits, because it was operated without a legitimate medical director; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and billed to GEICO and eligible for PIP reimbursement, when in fact the Fraudulent Services were not lawfully provided or billed to GEICO, and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services actually were performed, when in many cases they were not actually performed.

275.   The Personal Rehabilitation Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Personal Rehabilitation that were not reimbursable.

276.   GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its

business and property by reason of the above-described conduct in that it has paid at least $2,500,000.00 pursuant to the fraudulent bills that were submitted or caused to be submitted by the Personal Rehabilitation Defendants through Personal Rehabilitation.

277.   The Personal Rehabilitation Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

278.   Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## EIGHTEENTH CAUSE OF ACTION
### Against the Personal Rehabilitation Defendants
### (Unjust Enrichment)

279.   GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-143 above.

280.   As set forth above, the Personal Rehabilitation Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

281.   When GEICO paid the bills and charges submitted or caused to be submitted by the Personal Rehabilitation Defendants through Personal Rehabilitation, it reasonably believed that it was legally obligated to make such payments based on the Personal Rehabilitation Defendants' improper, unlawful, and/or unjust acts.

282.   The Personal Rehabilitation Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that the Personal Rehabilitation Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

283.   The Personal Rehabilitation Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

284.   By reason of the above, the Personal Rehabilitation Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $2,500,000.00.

285.   Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

### NINETEENTH CAUSE OF ACTION
### Against Ybor Medical
### (Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)

286.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-143 above.

287.   There is an actual case in controversy between GEICO and Ybor Medical regarding more than $75,000.00 in pending fraudulent claims for the Fraudulent Services that have been submitted to GEICO.

288.   Ybor Medical has no right to receive payment for any pending bills submitted to GEICO because it was unlawfully operated in violation of the Clinic Act.

289.   Ybor Medical has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not lawfully provided or billed to GEICO.

290.   Ybor Medical has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not performed by individuals who actually were licensed to perform the pertinent services, or else constituted non-reimbursable massage.

291.   Ybor Medical has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

292.   Ybor Medical has no right to receive payment for any pending bills submitted to GEICO because, in many cases, the Fraudulent Services never were provided in the first instance.

293.   Ybor Medical has no right to receive payment for any pending bills submitted to GEICO because the billing codes used for the underlying Fraudulent

Services misrepresented and exaggerated the level of services that purportedly were

provided in order to inflate the charges submitted to GEICO.

294. Accordingly, GEICO requests a judgment pursuant to the Declaratory

Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Ybor Medical has no right to

receive payment for any pending bills submitted to GEICO.

**TWENTIETH CAUSE OF ACTION**
**Against Duncan and Kalin**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

295. GEICO incorporates, as though fully set forth herein, each and every

allegation in paragraphs 1-143 above.

296. Ybor Medical is an ongoing "enterprise," as that term is defined in 18

U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

297. Duncan and Kalin knowingly have conducted and/or participated,

directly or indirectly, in the conduct of Ybor Medical's affairs through a pattern of

racketeering activity consisting of repeated violations of the federal mail fraud

statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or

cause to be submitted thousands of fraudulent charges on a continuous basis for over

six years seeking payments that Ybor Medical was not eligible to receive under the

No-Fault Law because: (i) Ybor Medical unlawfully was operated in violation of the

Clinic Act's medical director and licensing requirements; (ii) the underlying

Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the

underlying Fraudulent Services were not medically necessary and were provided – to

the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Ybor Medical Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

298.   A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "5".

299.   Ybor Medical's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Duncan and Kalin operated Ybor Medical, inasmuch as Ybor Medical was not engaged in a legitimate healthcare practice, and acts of mail fraud therefore were essential in order for Ybor Medical to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Ybor Medical Defendants continue to attempt collection on the fraudulent billing submitted through Ybor Medical to the present day.

300.   Ybor Medical is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Ybor Medical in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

301.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $330,000.00 pursuant to the fraudulent bills submitted through the Ybor Medical enterprise.

302.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**TWENTY-FIRST CAUSE OF ACTION**
**Against Duncan, Kalin, and Padron**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

303.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-143 above.

304.   Ybor Medical is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

305.   Duncan, Kalin, and Padron are employed by or associated with the Ybor Medical enterprise.

306.   Duncan, Kalin, and Padron knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Ybor

Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over six years seeking payments that Ybor Medical was not eligible to receive under the No-Fault Law because: (i) Ybor Medical unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Ybor Medical Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

307.   A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "5". Each such mailing was made in furtherance of the mail fraud scheme.

308.   Duncan, Kalin, and Padron knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

309.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $330,000.00 pursuant to the fraudulent bills submitted through the Ybor Medical enterprise.

310.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## TWENTY-SECOND CAUSE OF ACTION
### Against Ybor Medical, Duncan, and Kalin
### (Under Fla. Stat. 501.201 et. seq.)

311.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-143 above.

312.   Ybor Medical, Duncan, and Kalin are actively engaged in trade and commerce in the State of Florida.

313.   GEICO and its Insureds are "consumers" as defined by Fla. Stat. 501.203.

314.   Ybor Medical, Duncan, and Kalin engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

315.   The bills and supporting documents submitted or caused to be submitted by Ybor Medical, Duncan, and Kalin to GEICO were fraudulent in that they misrepresented: (i) Ybor Medical's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services actually were performed in the first instance.

316.   Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous.  Additionally, the conduct of Ybor Medical, Duncan, and Kalin has been materially injurious to GEICO and its Insureds.

317.   The conduct of Ybor Medical, Duncan, and Kalin was the actual and proximate cause of the damages sustained by GEICO.

318.   Ybor Medical, Duncan, and Kalin's unfair and deceptive acts have caused GEICO to sustain damages of at least $330,000.00.

319.   By reason of Ybor Medical, Duncan, and Kalin's conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2).

### TWENTY-THIRD CAUSE OF ACTION
### Against the Ybor Medical Defendants
### (Common Law Fraud)

320.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-143 above.

321.   The Ybor Medical Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of submitting, or causing to be submitted, thousands of fraudulent charges through Ybor Medical for the Fraudulent Services.

322.   The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that that Ybor Medical was in compliance with the Clinic Act and eligible to collect PIP Benefits in the first instance, when in fact Ybor Medical never was in compliance with the Clinic Act, and never was eligible to collect PIP Benefits, because it was operated without a legitimate medical director; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and billed to GEICO and eligible for PIP reimbursement, when in fact the Fraudulent Services were not lawfully provided or billed to GEICO, and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services actually were performed, when in many cases they were not actually performed.

323.   The Ybor Medical Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Ybor Medical that were not reimbursable.

324.   GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $330,000.00 pursuant to the fraudulent bills that were submitted or caused to be submitted by the Ybor Medical Defendants through Ybor Medical.

325. The  Ybor  Medical  Defendants'  extensive  fraudulent  conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

326.   Accordingly,  by  virtue  of  the  foregoing,  GEICO  is  entitled  to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**TWENTY-FOURTH CAUSE OF ACTION**
**Against the Ybor Medical Defendants**
**(Unjust Enrichment)**

327.   GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-143 above.

328.   As set forth above, the Ybor Medical Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

329.   When GEICO paid the bills and charges submitted or caused to be submitted by the Ybor Medical Defendants through Ybor Medical, it reasonably believed that it was legally obligated to make such payments based on the Ybor Medical Defendants' improper, unlawful, and/or unjust acts.

330.    The Ybor Medical Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that the Ybor Medical Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

331.    The Ybor Medical Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

332.    By reason of the above, the Ybor Medical Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $330,000.00.

### TWENTY-FIFTH CAUSE OF ACTION
### Against Nova Diagnostics
### (Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)

333.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-143 above.

334.    There is an actual case in controversy between GEICO and Nova Diagnostics regarding more than $75,000.00 in pending fraudulent claims for the Fraudulent Services that have been submitted to GEICO.

335.    Nova Diagnostics has no right to receive payment for any pending bills submitted to GEICO because it was unlawfully operated in violation of the Clinic Act.

336.    Nova Diagnostics has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not lawfully provided or billed to GEICO.

337.   Nova Diagnostics has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not performed by individuals who actually were licensed to perform the pertinent services, or else constituted non-reimbursable massage.

338.   Nova Diagnostics has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

339.   Nova Diagnostics has no right to receive payment for any pending bills submitted to GEICO because, in many cases, the Fraudulent Services never were provided in the first instance.

340.   Nova Diagnostics has no right to receive payment for any pending bills submitted to GEICO because the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

341.   Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Nova Diagnostics has no right to receive payment for any pending bills submitted to GEICO.

### TWENTY-SIXTH CAUSE OF ACTION
### Against Guerra, Brister, and Agdamag
### (Violation of RICO, 18 U.S.C. § 1962(c))

342.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-143 above.

343.   Nova Diagnostics is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

344.   Guerra, Brister, and Agdamag knowingly have conducted and/or participated, directly or indirectly, in the conduct of Nova Diagnostics' affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that Nova Diagnostics was not eligible to receive under the No-Fault Law because: (i) Nova Diagnostics unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Nova Diagnostics Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent

Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

345.   A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "5".

346.   Nova Diagnostics' business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Guerra, Brister, and Agdamag operated Nova Diagnostics, inasmuch as Nova Diagnostics was not engaged in a legitimate healthcare practice, and acts of mail fraud therefore were essential in order for Nova Diagnostics to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Nova Diagnostics Defendants continue to attempt collection on the fraudulent billing submitted through Nova Diagnostics to the present day.-

347.   Nova Diagnostics is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Nova Diagnostics in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

348.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $550,000.00 pursuant to the fraudulent bills submitted through the Nova Diagnostics enterprise.

349.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

<u>TWENTY-SEVENTH CAUSE OF ACTION</u>
Against Guerra, Brister, Agdamag, Kalin, Ramos, and De La Cruz
(Violation of RICO, 18 U.S.C. § 1962(d))

350.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-143 above.

351.   Nova Diagnostics is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

352.   Guerra, Brister, Agdamag, Kalin, Ramos, and De La Cruz are employed by or associated with the Nova Diagnostics enterprise.

353.   Guerra, Brister, Agdamag, Kalin, Ramos, and De La Cruz knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Nova Diagnostics' affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that Nova Diagnostics was not eligible to receive under the No-Fault Law

because: (i) Nova Diagnostics unlawfully was operated in violation of the Clinic Act's medical director and licensing requirements; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Nova Diagnostics Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

354.   A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "5". Each such mailing was made in furtherance of the mail fraud scheme.

355.   Guerra, Brister, Agdamag, Kalin, Ramos, and De La Cruz knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other automobile insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

356.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $550,000.00 pursuant to the fraudulent bills submitted through the Nova Diagnostics enterprise.

357.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**TWENTY-EIGHTH CAUSE OF ACTION**
**Against Nova Diagnostics, Guerra, Brister, and Agdamag**
**(Under Fla. Stat. 501.201 et. seq.)**

358.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-143 above.

359.   Nova Diagnostics, Guerra, Brister, and Agdamag are actively engaged in trade and commerce in the State of Florida.

360.   GEICO and its Insureds are "consumers" as defined by Fla. Stat. 501.203.

361.   Nova Diagnostics, Guerra, Brister, and Agdamag engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

362.   The bills and supporting documents submitted or caused to be submitted by Nova Diagnostics, Guerra, Brister, and Agdamag to GEICO were fraudulent in that they misrepresented: (i) Nova Diagnostics' eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided

and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services actually were performed in the first instance.

363.    Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous.  Additionally, the conduct of Nova Diagnostics, Guerra, Brister, and Agdamag has been materially injurious to GEICO and its Insureds.

364.    The conduct of Nova Diagnostics, Guerra, Brister, and Agdamag was the actual and proximate cause of the damages sustained by GEICO.

365.    Nova Diagnostics, Guerra, Brister, and Agdamag's unfair and deceptive acts have caused GEICO to sustain damages of at least $550,000.00.

366.    By reason of Nova Diagnostics, Guerra, Brister, and Agdamag's conduct, GEICO is also entitled to recover costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2).

**TWENTY-NINTH CAUSE OF ACTION**
**Against the Nova Diagnostics Defendants**
**(Common Law Fraud)**

367.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-143 above.

368.    The Nova Diagnostics Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of submitting, or causing to be submitted, thousands of fraudulent charges through Nova Diagnostics for the Fraudulent Services.

369.   The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that that Nova Diagnostics was in compliance with the Clinic Act and eligible to collect PIP Benefits in the first instance, when in fact Nova Diagnostics never was in compliance with the Clinic Act, and never was eligible to collect PIP Benefits, because it was operated without a legitimate medical director; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and billed to GEICO and eligible for PIP reimbursement, when in fact the Fraudulent Services were not lawfully provided or billed to GEICO, and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services actually were performed, when in many cases they were not actually performed.

370.   The Nova Diagnostics Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Nova Diagnostics that were not reimbursable.

371.   GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at

least $550,000.00 pursuant to the fraudulent bills that were submitted or caused to be submitted by the Nova Diagnostics Defendants through Nova Diagnostics.

372.   The Nova Diagnostics Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

373.   Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**THIRTIETH CAUSE OF ACTION**
**Against the Nova Diagnostics Defendants**
**(Unjust Enrichment)**

374.   GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-143 above.

375.   As set forth above, the Nova Diagnostics Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

376.   When GEICO paid the bills and charges submitted or caused to be submitted by the Nova Diagnostics Defendants through Nova Diagnostics, it reasonably believed that it was legally obligated to make such payments based on the Nova Diagnostics Defendants' improper, unlawful, and/or unjust acts.

377.   The Nova Diagnostics Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that the Nova Diagnostics

Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

378.   The Nova Diagnostics Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

379.   By reason of the above, the Nova Diagnostics Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $550,000.00.

## JURY DEMAND

380.   Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

 **WHEREFORE**, Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. demand that a Judgment be entered in their favor:

A.     On the First Cause of Action against Himes Clinic, for a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Himes Clinic has no right to receive payment for any pending bills submitted to GEICO;

B.     On the Second Cause of Action against Kalin, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $600,000 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.      On the Third Cause of Action against Kalin, Cabrera, Cabezas, Sosa, and Perez, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $600,000, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.      On the Fourth Cause of Action against Himes Clinic and Kalin, compensatory damages in an amount to be determined at trial but in excess of $600,000, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2);

E.      On the Fifth Cause of Action against Himes Clinic, Kalin, Cabrera, Cabezas, Sosa, and Perez, compensatory damages in an amount to be determined at trial but in excess of $600,000, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

F.      On the Sixth Cause of Action against Himes Clinic, Kalin, Cabrera, Cabezas, Sosa, and Perez, more than $600,000 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

G.      On the Seventh Cause of Action against Florida Wellness, for a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Florida Wellness has no right to receive payment for any pending bills submitted to GEICO;

H.      On the Eighth Cause of Action against Gomez and Kalin, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of

$930,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

I.     On the Ninth Cause of Action against Gomez, Kalin, and Vazquez , compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $930,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

J.     On the Tenth Cause of Action against Florida Wellness, Gomez, and Kalin, compensatory damages in an amount to be determined at trial but in excess of $930,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2);

K.     On the Eleventh Cause of Action against Florida Wellness, Gomez, Kalin, and Vazquez, compensatory damages in an amount to be determined at trial but in excess of $930,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

L.     On the Twelfth Cause of Action against Florida Wellness, Gomez, Kalin, and Vazquez, more than $930,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

M.     On the Thirteenth Cause of Action against Personal Rehabilitation, for a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Personal Rehabilitation has no right to receive payment for any pending bills submitted to GEICO;

N.      On the Fourteenth Cause of Action against Santos and Kalin, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $2,500,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

O.      On the Fifteenth Cause of Action against Santos, Kalin, and Ugarte, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $2,500,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

P.      On the Sixteenth Cause of Action against Personal Rehabilitation, Santos, and Kalin, compensatory damages in an amount to be determined at trial but in excess of $2,500,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2);

Q.      On the Seventeenth Cause of Action against Personal Rehabilitation, Santos, Kalin, and Ugarte, compensatory damages in an amount to be determined at trial but in excess of $2,500,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper; and

R.      On the Eighteenth Cause of Action against Personal Rehabilitation, Santos, Kalin, and Ugarte,  more than $2,500,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

S.      On the Nineteenth Cause of Action against Ybor Medical, for a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Ybor Medical has no right to receive payment for any pending bills submitted to GEICO;

T.      On the Twentieth Cause of Action against Duncan and Kalin, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $330,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

U.      On the Twenty-First Cause of Action against Duncan, Kalin, and Padron, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $330,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

V.      On the Twenty-Second Cause of Action against Ybor Medical, Duncan, and Kalin, compensatory damages in an amount to be determined at trial but in excess of $330,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2);

W.      On the Twenty-Third of Action against Ybor Medical, Duncan, Kalin, and Padron, compensatory damages in an amount to be determined at trial but in excess of $330,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

X.      On the Twenty-Fourth Cause of Action against Ybor Medical, Duncan, Kalin, and Padron, more than $330,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

Y.      On the Twenty-Fifth Cause of Action against Nova Diagnostics, for a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Nova Diagnostics has no right to receive payment for any pending bills submitted to GEICO;

Z.      On the Twenty-Sixth Cause of Action against Guerra, Brister, and Agdamag compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $550,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

AA.    On the Twenty-Seventh Cause of Action against Guerra, Brister, Agdamag, Kalin, Ramos, and De La Cruz, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $550,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

BB.    On the Twenty-Eighth Cause of Action against Nova Diagnostics, Guerra, Brister, and Agdamag, compensatory damages in an amount to be determined at trial but in excess of $550,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2);

CC.    On the Twenty-Ninth Cause of Action against Nova Diagnostics, Guerra, Brister, Agdamag, Kalin, Ramos, and De La Cruz, compensatory damages in an amount to be determined at trial but in excess of $550,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper; and

DD.    On the Thirtieth Cause of Action against Nova Diagnostics, Guerra, Brister, Agdamag, Kalin, Ramos, and De La Cruz, more than $550,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

Dated:        November 1, 2021

*/s/ John P. Marino*
John P. Marino (FBN 814539)
Lindsey R. Trowell (FBN 678783)
Kristen L. Wenger (FBN 92136)
SMITH, GAMBRELL & RUSSELL, LLP
50 North Laura Street, Suite 2600
Jacksonville, Florida 32202
Phone:  (904) 598-6100
Facsimile:  (904) 598-6204
ltrowell@sgrlaw.com
jmarino@sgrlaw.com
kwenger@sgrlaw.com

*Attorneys for Plaintiffs*